**OMAHA PUBLIC POWER DISTRICT, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 96–616 C.**

United States Court of Federal Claims.

July 26, 1999.

Robert A. Mangrum, Winston & Strawn, Washington D.C., attorney of record for plaintiff, Eric J. Marcotte, and Daniel F. Stenger, of counsel.

Theodore R. Carter, III, with whom were Acting Assistant Attorney General David W. Ogden, Director J. Christopher Kohn, and Deputy Director Sandra P. Spooner, Civil Division, Commercial Litigation Branch, Department of Justice, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

In the Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776 (codified as amended in various sections of 42 U.S.C.),

Congress directed the collection of a special fee from all domestic electric utility companies that previously had purchased enriched uranium from the Government for the generation of electrical energy. The fee, which is to remain in effect for fifteen years following the Act's enactment or until $2.5 billion has been collected, is deposited into a special fund, the Uranium Decontamination and Decommissioning Fund (the "D & D Fund"), to be used to meet the clean-up costs of the Government facilities where the uranium enrichment activities were carried out.

The lawfulness of this fee was the subject of a legal challenge in *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569 (Fed.Cir. 1997), *rev'g* 33 Fed.Cl. 580 (1995), *cert. denied* —— U.S. ——, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998). In that case, a similarly-situated plaintiff argued that the Government's imposition of the fee violated the fixed-price character of the contracts under which the enriched uranium had been sold to the utility companies. While the trial court initially accepted the plaintiff's argument, the Federal Circuit reversed, holding that the fee constituted "a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." *Id.* at 1577.

The same fee is once again brought under attack in this case. The arguments we encounter now are that the imposition of the fee amounts to an unconstitutional taking of property, a violation of substantive due process and a denial of equal protection.

The Government has moved to dismiss for failure to state a claim on which relief can be granted. Plaintiffs oppose.[1] The parties have filed extensive briefs and oral argument was heard on May 18, 1999. We now decide in defendant's favor.

### FACTS

Beginning in the 1940s, the Government, acting originally through the Atomic Energy Commission and later through the Department of Energy (DOE), owned and operated a number of uranium enrichment facilities as part of the national defense program. For almost 25 years, most of the uranium produced at these plants—approximately 96%—was used solely for national defense purposes. In the mid–1960s, however, the Government decided to make its enrichment services available to commercial customers, a decision that was implemented by entering into a series of contracts with various public utilities permitting their purchase of enriched uranium for the generation of electricity. In the main, these contracts provided for the sale of uranium at a fixed price, determined according to prevailing rates established by the Commission at the time the service was provided.

In the early 1990s, following nearly fifty years of uranium enrichment activity, Congress decided to privatize its enrichment facilities by creating a new, for-profit, governmental corporation called the United States Enrichment Corporation ("USEC"). Under the Energy Policy Act of 1992, USEC was to assume operational control of the enrichment facilities, with the goal of ultimately selling the facilities to private investors. DOE, concerned that the cost of decontaminating the plants would stand as an obstacle to attracting private investment, lobbied Congress to exempt USEC from all clean-up-cost liability. Congress agreed, specifying that all pre-enactment liabilities—including the cost of decontaminating and decommissioning the plants—would remain the responsibility of DOE.

As part of the Energy Policy Act, then, Congress established the Uranium Enrichment Decontamination and Decommissioning Fund to pay for the clean-up of the government-owned enrichment facilities. The Act specified that a portion of the clean-up costs—specifically $330 million annually, or 68% of the required amount—would be con-

---

1. Although their cases have not been formally consolidated, the actions filed by Maine Yankee Atomic Power Company, docket number 97–28C, Sacramento Municipal Utility District, docket number 95–823C, and Omaha Public Power District, docket number 96–616C, present nearly identical issues that were briefed and argued together. Accordingly, this opinion speaks to all three claims.

tributed by Congress from appropriated funds. The remaining third, a figure not to exceed $2.5 billion, would be collected in up to $150 million annual installments over a fifteen-year period from those domestic utility companies that had earlier used government-enriched uranium in the generation of electricity. 42 U.S.C.A. § 2297g-1 (West 1994 & Supp.1999). The utilities' portion was subject to annual and aggregate caps, with Congress, by statute, obligated to make up the difference.

Three aspects of the D & D Fund are, from plaintiffs' perspective, worthy of note. First, the fee imposed by the Energy Policy Act applies only to the end-users of the uranium. Thus, a utility that had contracted with the Government for the purchase of uranium but then had resold the uranium to another utility would not be subject to the fee. As a result, the list of utilities responsible for the fee is strikingly similar to, but not entirely coincident with, the list of utilities that had contracted with the Government. Second, the special assessments are imposed only on those utilities that purchased government-enriched uranium prior to the Energy Policy Act's 1992 enactment, and thus do not apply to domestic customers who purchased USEC services any time after 1992. Finally, the Act specifies that foreign utilities, despite having represented 25% of DOE's pre–1992 commercial customer base, are not subject to the fee.

Under the Act, the fee itself is based on the percentage of uranium enrichment work units each utility had previously purchased from the Department of Energy, relative to the total number of work units produced by DOE over the life of the enrichment facilities. That contribution scheme—apportioning liability for the fee on the basis of pro-rata consumption of uranium—was first challenged in *Yankee Atomic*, 112 F.3d 1569 as a violation of the utilities' fixed-price contracts for the purchase of uranium.

The Federal Circuit, as we earlier noted, rejected Yankee Atomic's claim that the Energy Policy Act impermissibly raised the price of uranium in breach of the parties' fixed-price contracts with the Government. Characterizing the fee as a "general exercise of Congress's taxing power," the Federal Circuit concluded that the assessment was "not a deliberate retroactive increase in the price of those contracts," but was instead "the Government's way of spreading the costs of the later discovered decontamination and decommissioning problem on all utilities that benefited from the Government's service." *Id.* at 1577, 1580.

The plaintiffs now before this court—Maine Yankee Atomic Power Company, Sacramento Municipal Utility District and Omaha Public Power District—each signed enrichment contracts with the Government which, in their original form, were largely identical to the contracts between Yankee Atomic and the Government.[2] As a result of the uranium purchases made under those contracts, plaintiffs, like Yankee Atomic, have been subject to the assessment outlined in the Energy Policy Act. As of the date of suit in this court, Omaha Public Power District had paid approximately $7.4 million of the $19 million it is projected to owe under the Energy Policy Act for purchases of uranium made from 1969 until 1992; Maine Yankee Atomic Power Company had paid $9,815,718.57 of its estimated $25 million liability on uranium purchases from 1970 until 1986; and Sacramento Municipal Utility District had paid more than $5.8 million of its projected $8 million liability for uranium purchased from 1969 until 1981. Of the three utilities, only one—Maine Yankee—has abandoned the electricity generating business entirely, closing down its sole electricity generating facility permanently in 1996.

## DISCUSSION

In the first count of their amended complaints,[3] plaintiffs assert that the imposition

2. Omaha Public Power maintains that the Utility Services Contract and the Supplemental Agreement of Settlement it signed in 1984 (terminating all existing uranium contracts and providing that "all obligations arising under [its then existing] contract shall be deemed to be concluded") differentiates its contract from the contracts at issue in *Yankee Atomic*. We address this contention later in this opinion.

3. The claims now before us were pending, but stayed, while the parallel claim in *Yankee Atomic* was proceeding before the trial and appellate

of a monetary liability which is both retroactive and unconnected to their past conduct deprives them of property rights in violation of the Takings Clause of the Fifth Amendment. The second count sets forth a due process claim based on similar contentions—that the assessment is unconstitutional to the extent that it imposes on plaintiffs a severe, disproportionate and extremely retroactive liability. Plaintiffs' third and final count alleges a taking and /or breach of plaintiffs' contract-based rights.

Defendant, in turn, has moved to dismiss plaintiffs' claims. It contends first that plaintiffs' takings and due process arguments were considered and rejected by the Federal Circuit in *Yankee Atomic* and, under the principle of *stare decisis*, should not be revisited. Second, defendant argues that the holding in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), striking down as unconstitutional the imposition of a severely retroactive liability on a party that had no reason to anticipate the liability and whose experience was not commensurate with the burden later imposed, is not dispositive of the issues before us. Finally, defendant maintains that even under the traditional tenets of due process and takings law, plaintiffs' claims must fail. We address those arguments in turn.

## I. *Stare Decisis*

In urging us to apply the doctrine of *stare decisis*, defendant argues that the *Yankee Atomic* ruling, upholding the assessment on the grounds that it constitutes a general tax falling proportionally on those utilities that had benefited from the Government's services, disposes of the issues now before us. While we agree that the *Yankee Atomic* decision goes a long way in addressing plaintiffs' present arguments, we are unconvinced, however, that the decision forecloses plaintiffs' takings and due process claims. Only to the extent that plaintiffs now attempt to maintain contract-based claims—an issue ar-

gued before, and rejected by, the Federal Circuit in *Yankee Atomic* —do we find the doctrine of *stare decisis* to be applicable.

In reaching this conclusion, we begin with a fundamental principle of *stare decisis:* in order for an issue of law to be seen as settled, and hence binding, it must have been both heard and decided by an earlier court. 18 James Wm. Moore et al., Moore's Federal Practice § 134.04[2] (3d ed.1998). *Stare decisis* applies "only to legal issues that were actually decided in a prior action" and not to those which were neither "litigated [n]or resolved." *Beacon Oil Co. v. O'Leary*, 71 F.3d 391, 395 (Fed.Cir.1995). In addition, a case will not be treated as binding precedent on a point of law where the holding is only implicit or assumed in the decision but is not announced. *United States v. L.A. Tucker Truck Lines*, 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952).

Two obstacles prevent us from invoking the doctrine of *stare decisis*. As an initial matter, we do not believe the *Yankee Atomic* decision explicitly rules on, nor even squarely addresses, plaintiffs' takings or due process arguments. As we discuss below, the takings and due process claims put forth by Yankee Atomic differ in crucial respects from the takings and due process claims now before this court. In addition, the Supreme Court's opinion in *Eastern Enterprises* —issued after the *Yankee Atomic* decision—adds a new perspective to the issues at hand. To the extent that the decision must guide our own thinking, we are not prepared to conclude that the decision would in no way have shaped the Federal Circuit's thinking in *Yankee Atomic* as well. And it is this subtle shift in legal thought we are now bound to explore.

Considering first the scope of the *Yankee Atomic* decision, we note that while the Government is correct in asserting that the *Yankee Atomic* court considered both due process and takings challenges to the Energy

---

courts. In light of the decision in *Yankee Atomic*, plaintiffs filed amended complaints in which they essentially have distanced themselves from their earlier contract-based theories. Plaintiffs attempt now to move forward under the theories set forth in *Eastern Enterprises v. Apfel*, 524 U.S.

498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), specifically that a retroactive imposition of liability may, in certain circumstances, constitute a violation either of the Takings Clause or Due Process Clause of the Fifth Amendment.

Policy Act assessment, it considered only a single aspect of those challenges: whether the contract rights, establishing a fixed price for government-provided enrichment services, had been taken or otherwise violated. The court was not asked to address, nor did it consider, whether the assessment, properly treated as a tax, met the standards of takings and due process law as applied simply to governmental demands for money.

Indeed, the takings claim that was presented and briefed in *Yankee Atomic* was the taking of a contract right. The trial court explicitly characterized the assessment as a revision in contract price, and held the assessment unconstitutional on the grounds that it deprived Yankee Atomic of the economic benefit provided by the contract. To the extent that a taking or, in the words of the trial court, an illegal exaction, had occurred, the illegality was specifically predicated on a violation of contract-based rights.

The contract-based approach to the problem continued at the appellate level: "The decision of the Court of Federal Claims is driven by its characterization of the special assessment as a retroactive price increase rather than an exercise of the sovereign's taxing power, and the parties' dispute over this characterization frames the dispositive issue of this appeal." *Yankee Atomic*, 112 F.3d at 1573. However, in focusing on what the assessment was not—an impermissible infringement on *contract* rights—the Federal Circuit was not required to explore the full dimensions of what it concluded the assessment in fact was—the imposition of a tax. Accordingly, the court made no explicit findings with regard to whether money, rather than contract rights, had indeed been taken.

Similarly, while the alleged retroactivity of the fee was a feature of the *Yankee Atomic* case, it was not, either in the arguments before the court or in the court's decision, treated as a true factor in assessing the fee's constitutionality. To the extent that due process or takings issues were addressed, the focus remained on the Government's action as it affected contract rights, not as a limitation on the Government's power to tax. "Re-

gardless of whether the situation is characterized as a breach of contract, an unlawful taking, or an unlawful exaction, the arguments stem from Yankee Atomic's prior contracts with the Government." *Id.* at 1574 n. 2. *Yankee Atomic* thus offers us no guidance as to what restrictions on the Government's taxing power takings law or due process may in fact impose.

In assessing the applicability of *stare decisis*, then, we must ask ourselves whether we can be assured that *Yankee Atomic* answered, in a deliberate fashion, the questions plaintiffs raise here: whether, independent of any contract right, the special assessment imposed by the Energy Policy Act amounted to a taking of plaintiffs' money; whether the liability itself was so retroactive, so divorced from plaintiffs' experiences and so contrary to their expectations that it violated due process. These questions, we believe, were not answered.

With regard to plaintiffs' contract-based claims,[4] however, we find *Yankee Atomic* to be dispositive. In determining that the assessment constituted an exercise of general taxation apart from, and wholly independent of, the parties' earlier contractual relationship, the Federal Circuit rejected the contention that the assessment amounted to an impermissible infringement on the plaintiff's contract-based rights. This court, in turn, is bound by that ruling.

Nor do the additional contract documents put forth by Omaha Public Power District change that result. We see nothing in the Utility Services Contract or the 1984 Supplemental Agreement to differentiate it from the contract that was at issue in *Yankee Atomic*. And to the extent that the fixed-price terms of the contract were held by the Federal Circuit not to constitute an unmistakable promise, no additional terms in the Supplemental Agreement satisfy that unmistakability requirement. The unmistakability doctrine—a principle which dictates that immunity from future legislation (here, a tax) be clearly, unmistakably incorporated into a contract with the Government in order to be

---

4. With the exception of Omaha Public Power District, plaintiffs concede the preclusive effect of

*Yankee Atomic* and reiterate their contract claims merely to preserve the issue for appeal.

enforced—requires more than the generic statements embodied in the Supplemental Agreement or the extra-contractual assurances by Government officials allegedly made to Omaha.

## II. The *Eastern Enterprises* Decision

### A. The Essential Ruling

■ Moving forward, then, with plaintiffs' due process and takings claims, we begin with the contentions that the Energy Policy Act assessment impermissibly imposes financial liability on parties not responsible for the problem that the legislation addresses, and is based on conduct excessively far in the past. As evidence of those two propositions, plaintiffs point first to testimony offered before a congressional subcommittee to the effect that it was the use of the enrichment facilities by the U.S. military that alone contaminated the plants, and that the subsequent enrichment of uranium for commercial purposes added no additional contamination.[5] Plaintiffs additionally point to the fact that the fees levied are based; in some instances, on purchases of uranium that occurred some twenty-three years before the passage of the Energy Policy Act.

Plaintiffs' orientation to the present problem is shaped in large part by the holding in *Eastern Enterprises*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451—a decision defendant maintains is inapplicable to the facts at hand. In *Eastern Enterprises*, a coal mining company challenged the Coal Industry Retiree Health Benefit Act of 1992 (the Coal Act), charging that the act was unconstitutional as applied to it. The Coal Act obligated Eastern to pay premiums, beginning in 1992, to cover health care benefits for former employees who had worked for Eastern prior to 1966, despite the fact that Eastern itself had ceased its mining operations in 1965. Central to the Supreme Court's analysis was the fact that, of the various bargaining agreements signed by the coal industry throughout the years, only those agreements reached after 1965—i.e., those in which Eastern Enterprises had not participated—contained explicit reference to, or fostered expectations of, lifetime health benefits.

A four-justice plurality held that the assessment, reaching back more than thirty years and unrelated to the company's experience with the health-care plans, violated the Takings Clause. One justice, concurring in the result, rejected the applicability of the Takings Clause, but reached his conclusion based on due process grounds. In contrast, a four-justice dissent concluded that the Takings Clause was inapplicable, and that due process had not been violated.

It is the fractured nature of that decision which defendant believes limits its holding. This court need not apply a takings analysis, defendant maintains, since a majority of the Court—the four dissenters along with Justice Kennedy in his concurrence [6]—explicitly rejects the applicability of the Takings Clause to "an ordinary liability to pay money." *Eastern Enterprises*, 524 U.S. at ——, 118 S.Ct. at 2162 (Breyer, J., dissenting). And in the absence of *Eastern Enterprises*, defendant contends, prevailing case law would only require the act to meet a standard of rationality in order to withstand a constitutional challenge.

While we recognize that the takings analysis employed by the plurality in *Eastern*

---

**5.** *See*, for instance, *Department of Energy Budget Request for Fiscal Year 1993: Oversight Hearing before the Subcommittee on Energy and the Environment of the Committee on Interior and Insular Affairs*, 102d Cong., 2d Sess. at 79 (Feb. 28, 1992) (statement of William H. Young, Assistant Secretary for Nuclear Energy, United States Department of Energy) (acknowledging that "the contamination that was placed on the systems and structures occurred during that 20–year period that it was operated for the government").

**6.** The dissent rejected the plurality's takings analysis on the ground that the case involved "not an interest in physical or intellectual property, but an ordinary liability to pay money, and not to the Government, but to third parties." *Eastern Enterprises*, 524 U.S. at ——, 118 S.Ct. at 2162 (Breyer, J., dissenting). Justice Kennedy, writing in concurrence, further cautioned that "[t]he plurality's opinion disregards this requirement [that a specific property right or interest be at stake] and, by removing this constant characteristic from takings analysis, would expand an already difficult and uncertain rule to a vast category of cases not deemed, in our law, to implicate the Takings Clause." *Id.* at ——, 118 S.Ct. at 2155 (Kennedy, J., concurring).

*Enterprises* does not necessarily reflect the approach advocated by the remaining members of the Court, we are nonetheless mindful of the D.C. Circuit's observation that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court must be viewed as that position taken by those members who concurred in the judgments on the narrowest grounds.'" *King v. Palmer*, 950 F.2d 771, 783 (D.C.Cir.1991) (quoting *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)) (emphasis omitted).

If *Eastern Enterprises* does not stand for a single, distinct approach to the problem before it, it nonetheless stands for a clear principle: a liability that is severely retroactive, disruptive of settled expectations and wholly divorced from a party's experience may not constitutionally be imposed. We draw that conclusion from the language offered both by the plurality and by the concurrence. The plurality pointed out that Supreme Court decisions "have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Eastern Enterprises*, 524 U.S. at ——, 118 S.Ct. at 2149. The plurality then went on to criticize the assessment as "not calibrated either to Eastern's past actions or to any agreement—implicit or otherwise—by the company," rejecting the liability on the grounds that it was "substantial in amount, based on the employer's conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused." *Id.* at ——, 118 S.Ct. at 2153. Similarly, Justice Kennedy, in his concurrence, looked to the "degree of retroactive effect" as a "significant determinant" in assessing a statute's constitutionality. *Eastern Enterprises*, 524 U.S. at ——, 118 S.Ct. at 2159 (Kennedy, J., concurring). Noting that the retroactivity in *Eastern* was of "unprecedented scope," he

concluded that, to the extent that Eastern was responsible neither for the miners' expectations of life-long health benefits nor for the benefit plan's fiscal instability, it could not constitutionally be made to bear the burden imposed by the Coal Act. *Id.*

The *Eastern Enterprises* test thus asks us to look more broadly—whether through the lens of takings or due process—at the equity of imposing retroactive liability if the length of the retroactivity is great and the party's experience with the underlying problem inconsequential.

**B.   The Ruling Applied**

■   In examining the factors which unified the plurality and the concurrence in *Eastern Enterprises*, we begin first with the magnitude of the retroactivity.   Plaintiffs urge us to measure the length of retroactivity from the time the utilities first purchased uranium from the Government, on the grounds that the assessment changes the consequences of transactions dating back to those years.   By plaintiffs' calculations, the assessment taxes Omaha and Sacramento on purchases made twenty-three years before the statute's enactment, and Maine Yankee on purchases made twenty-two years before that date.

i.   Retroactivity

While at first glance the length of time appears to rival the thirty to fifty-year period found objectionable in *Eastern Enterprises*, those numbers belie an important distinction: Eastern Enterprises had left the coal business almost thirty years before the Coal Act's passage, and was no longer a member of the industry either at the time the expectation of lifetime benefits was fostered or at the time the existing benefit fund became unstable.   Plaintiffs, in contrast, continued to participate in the uranium enrichment field, in at least one instance, up until the date of the Energy Policy Act's passage[7] and had, by definition, contemporaneous exposure to the process (i.e., the enrichment)

---

**7.**   Omaha Public Power District continued to purchase government-enriched uranium until 1992; Maine Yankee until 1986 and Sacramento Municipal Utility District until 1981.   In the case of

Sacramento, however, its contracts with the Government continued until 1990 even though it had exercised opt-out provisions to permit its purchase of uranium from other sources.

which created the problem. While the import of that distinction may not be immediately obvious, it goes to the heart of the case against retroactive law-making. The objection to retroactivity is not simply that a transaction is "reopened," but that legitimate, long-settled expectations are themselves disrupted. Put simply, retroactivity most offends when dealings an individual reasonably views as both completed and long-past are, without legitimate justification, again called into account. We explain further.

To the extent that Eastern had left the coal business entirely and had done so at a time when the driving forces behind the Coal Act—the miner's expectations of lifetime benefits and the instability of the benefit fund—had yet to come into existence, it could reasonably have concluded that its dealings in the coal industry were complete. The *Eastern Enterprises* decision taught in part that such thirty-year-old expectations should not be lightly undone. Plaintiffs' situation offers no parallel: unlike Eastern, they did not leave the industry decades before the imposition of liability, nor were they charged with remedying a problem that was still to be recognized at the time they completed the conduct on which their liability was later to be based. Plaintiffs, still purchasing uranium well into the 1980s and 1990s (and presumably aware, at least in a general sense, of the problem of contamination), could not reasonably have harbored the same sense of closure with regard to those transactions as did the plaintiff in *Eastern Enterprises*.

The Energy Policy Act's retroactive effect extends, at most, for less than a decade, though we see no need actually to quantify that period. As intimated above, what concerns us is not the length of the period per se—one could hardly maintain, for instance, that an eleven-year reach-back is unacceptable while a nine-year reach-back passes muster—but the reasons for the retroactivity and the retroactivity's effect. *Eastern Enterprises* teaches that, even in the face of severe retroactivity (not, we believe, the present situation), the extent of a statute's retroactivity is not the only factor to be considered in determining the legislation's constitutionality. We turn then to the other factors.

### ii. Proportionality—Present Burden and Past Conduct

Significant also to the *Eastern Enterprises* analysis was the fact that Eastern had no reason to anticipate the liability imposed on it, and its burden was substantially disproportionate to its experience. Focusing on the proportionality of the current plaintiffs' burden to their experience, we make two general but crucial observations: the plaintiffs' burden, ultimately, was small, and its experience—at least for the purposes of assigning liability—was great. We explore those conclusions further.

With regard to the magnitude of the liability, we begin with the point that a lion's share of the expense for the clean-up—some 68%—is to be funded by Congress through public appropriations. The utilities, from the beginning, were slated only to shoulder less than a third of the total costs. In addition, the Energy Policy Act contains a specific pass-through mechanism, designed to ensure that the utilities' present customers, rather than the utilities themselves, bear the ultimate expense of the assessment.[8] That amount, spread over a wide customer base and included as a present cost of fuel, is a far less substantial burden—either on the utilities or on its customers—than the one challenged in *Eastern Enterprises*.

Turning next to the experience criterion, we note first that the calculation of liability was not, in the words of the Supreme Court "made in a vacuum." *Eastern Enterprises,* 524 U.S. at ——, 118 S.Ct. at 2150 (quoting *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 225, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986)). The assessments are based on each utility's pro rata consumption of uranium—a method which explicitly allocates liability in direct proportion to the amount of

---

8. 42 U.S.C. § 2297g–1(g), titled "Treatment of assessment" provides that "[a]ny special assessment levied under this section ... shall be deemed a necessary and reasonable current cost of fuel and shall be fully recoverable in rates in all jurisdictions in the same manner as the utility's other fuel costs."

uranium received and used. In that respect, then, the assessment is exactly as the Federal Circuit described it in *Yankee Atomic:* "a general tax that falls proportionally on all utilities that benefited from the DOE's uranium enrichment services." *Yankee Atomic,* 112 F.3d at 1575. And as the Federal Circuit there recognized, "the costs of large, unrecognized societal problems are frequently spread among those who benefited from the source of the problem." *Id.* at 1576 n. 6.

Plaintiffs object to that justification on the grounds that it was the U.S. military—rather than they—who allegedly caused the contamination of the enrichment facilities. Yet even if we were to accept plaintiffs' contention that the uranium sold to plaintiffs caused *no* additional contamination (as indeed we must for the purposes of this motion), we nonetheless conclude that plaintiffs received a benefit—i.e., the enriched uranium—made possible only through the prior contamination of the plants. Thus, plaintiffs' situation readily accommodates itself to the observation noted by the Supreme Court in *United States v. Sperry Corp.,* 493 U.S. 52, 65, 110 S.Ct. 387, 107 L.Ed.2d 290 (1989) that "[i]t is surely proper for Congress to legislate retrospectively to ensure that costs of a program are borne by the entire class of persons that Congress rationally believes should bear them."

Plaintiffs respond that, to the extent that the enrichment services represented a benefit, it was a benefit for which they had already paid in full through their contract price. Yet, as discussed in *Yankee Atomic,* the assessment does not represent an increase in contract price, but rather the imposition of liability to remedy a social ill. *Yankee Atomic,* 112 F.3d at 1575. And the fact that the contamination—a partial legacy of plaintiffs' dealings with the Government—exists, necessarily means that there remain unpaid social costs of those transactions. That plaintiffs could have purchased their uranium elsewhere (and, as with Sacramento,

did in fact do so) [9] is beside the point. The contamination clean-up is an "actual, measurable cost of [the] business" in which plaintiffs chose to participate. *Eastern Enterprises,* 524 U.S. at ——, 118 S.Ct. at 2159 (quoting *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 19, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)).

The question whether plaintiffs could have anticipated the liability is an inquiry closely related, if not identical, to the considerations which underpin our concerns about retroactivity and experience. Retroactivity is largely objectionable, for instance, to the extent it cannot be anticipated (with all the concomitant issues such lack of notice engenders), and a close experiential connection between the burdened party and the fee imposed necessarily means that the liability should have been anticipated. While we discuss below—in our assessment of the reasonableness of their investment-backed expectations—the extent to which plaintiffs might have anticipated their Energy Policy Act liability, we note only that plaintiffs' participation in so highly regulated a field and their receipt of benefit from that field should each have served as notice of a possible future obligation. Heavy industry regulation of the sort seen in the nuclear industry means that few legislative changes can truly be seen as wholly unanticipated. *Atlas Corp. v. United States,* 895 F.2d 745, 758 (Fed.Cir.1990). And, as a more general matter, those who create a burden for society or who benefit from a burden's creation must be seen as implicitly accepting responsibility and possessing constructive knowledge that they may one day be called to account.

Thus, none of the factors found crucial in *Eastern Enterprises*—the length of the retroactivity, the unforeseen nature of the assessment or the disconnect between Eastern's conduct and its resulting liability, militate against a finding of constitutionality in the present case. In short, the assessment is not an unlawful exaction.

---

**9.** As a result of competition from foreign uranium suppliers, including facilities in France, Canada, Italy, Russia, China, India and England, the Government's share of the enrichment market declined from almost 100% in the 1960s and 1970s to less than 50% in 1983. When foreign suppliers offered lower prices—specifically in 1984, 1985, 1987, 1988 and 1990—Sacramento elected not to exercise its contract right to purchase uranium from the Government in those years.

### III. The Energy Policy Act as a Taking

In spite of the divided nature of the *Eastern Enterprises* decision, however, plaintiffs nonetheless urge us to apply the plurality's takings analysis to find that the Energy Policy assessment constitutes a compensable taking of plaintiffs' property. Yet, despite our reservations about that approach, we conclude that even when viewed through a traditional takings analysis, plaintiffs' claim must fail. None of the factors cited in *Eastern Enterprises* —the economic impact of the legislation, the reasonableness of plaintiffs' investment-backed expectations and the character of the government action—support the finding of a taking of property. We explain further.

As discussed above, the magnitude of the liability imposed on plaintiffs is sharply diminished by their ability to pass through the costs to their customers. 42 U.S.C. § 2297g–1(g).[10] The fact that the tax burden falls, as Sacramento acknowledges, on Sacramento's "current and future ratepayers," necessarily means that the economic impact on Sacramento—limited perhaps to incidental costs of collection—is slight. Thus, plaintiffs cannot show "any deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking." *Keystone Bituminous Coal Assn. v. De Benedictis*, 480 U.S. 470, 493, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987).[11]

As to their investment-backed expectations, plaintiffs offer a host of reasons why they reasonably did not expect to be subject to the fee in question: the fixed-price nature of their original contracts; the supplemental agreements of settlement signed by Sacramento & Omaha purporting to settle all claims; the statutory requirement that the prices as originally set be sufficient to recover all costs; the settled expectations of twenty-two year's time; and the Government's sole possession and control of the enrichment facilities.

What that assessment overlooks, however, is the benefit conferred on plaintiffs as a byproduct of the contamination's creation. Retroactive legislation is most suspect when it deprives citizens of legitimate expectations. But legitimate expectations cannot include an expectation of immunity from legislation that imposes additional costs on activities from which the plaintiff derived a prior benefit. As the Federal Circuit has pointed out, a commercial expectation, harbored in a field as regulated as the nuclear industry, that a company will not have to "spend its own money to remediate health and environmental hazards created by its own production of uranium" is simply unreasonable. *Atlas*, 895 F.2d at 758.

In assessing the nature of the government action, the court in *Eastern Enterprises* concluded that the liability was "quite unusual" as it "singles out certain employers to bear a burden that is substantial in amount, based on the employer's conduct far in the past, and unrelated to any commitment that the employers made or to any injury they caused...." *Eastern Enterprises*, 524 U.S. at ——, 118 S.Ct. at 2153. But while plaintiffs make much of the fact that, according to the Government's own account, the contamination occurred during the twenty years the facilities were operated solely for governmental purposes, we do not find that factor dispositive. All indicators point to the fact that Congress, confronted with a hazard created by uranium enrichment, looked for partial contribution from those who created the demand for the uranium.

---

10. *Hughes Communications Galaxy, Inc. v. United States*, 38 Fed.Cl. 578 (1997), a case provided to us by plaintiffs, does not reach a contrary result. There, the court concluded in a breach of contract action that the contractor's ability to receive indemnification from third parties in no way affected the measure of the damages resulting from the Government's breach. Such reasoning has no application in the takings context, where the ability to pass on a cost speaks not to the measure of damages, but to the economic impact of the challenged action.

11. The fact that Maine Yankee ceased its operations in 1996 and presumably can no longer pass on the fee to its customers does not change the analysis. Maine Yankee was in business at the time of the Energy Policy Act's passage, meaning that it, like the other domestic utilities to which the act applied, was intended—and able—to pass on those costs. That Maine Yankee later chose to leave the industry, fully aware of its existing obligations, cannot transform either the character of the government action or the economic impact of the Act as it was originally imposed.

Ultimately, it is that determination which most sways us. Whether we analyze the assessment under the Due Process Clause, under the Takings Clause, or under some amalgam of the two, we are, in the end, faced with a single, basic question: Is it inherently unfair, unjust, or irrational for Congress, when faced with costs resulting from the enrichment of uranium, to ask those parties who received the uranium to contribute to the solution? The answer, quite clearly, is no. Plaintiffs' assessments are directly proportional to their usage of uranium enrichment services—the very services which created the contamination. Congress itself took responsibility for more than two thirds of the clean-up costs and assigned the rest, as a general tax, to the rate-payers in districts which had previously benefited from nuclear power. Such a scheme can hardly be construed as beyond the reach of fairness or rationality. Accordingly, we are bound to conclude there has been no taking here.

## IV. Equal Protection

■ Although the Energy Policy assessment comports, in our view, with both takings law and due process, plaintiffs nonetheless argue that the fee constitutes a violation of equal protection. According to plaintiffs, the fact that foreign utilities were exempted from the assessment impermissibly differentiates between similarly-situated entities— i.e., all those that had consumed government-enriched uranium. In addition, plaintiffs contend, the Act draws an illegitimate distinction between purchasers who resold the uranium, and those who kept it for their own purposes, as well as between pre–1992 consumers (who are subject to the fee) and post– 1992 consumers (who are exempt).

The short answer to plaintiffs' objection is that the drawing of such categories neither implicates nor violates the 14th Amendment. With regard to Congress's decision to exempt foreign utilities from liability, we refer to the Supreme Court's observation in *Barclay & Co. v. Edwards*, 267 U.S. 442, 451, 45 S.Ct. 135, 69 L.Ed. 703 (1924) that "[c]onsiderations of policy toward foreign countries may very well justify an exemption of the foreign corporations from taxes that might legitimately be imposed on them, but which Congress does not think it wise to exact." In addition, we think it significant that, as defendant points out in its motion to dismiss, the exclusion of foreign utilities from the liability equation in no way increases or otherwise affects plaintiffs' portion of domestic utility usage.

Similarly, legislatures need not burden the most responsible party to survive rational basis review. *Association of Bituminous Contractors, Inc. v. Apfel*, 156 F.3d 1246, 1255–56 (D.C.Cir.1998). While the original purchasers of uranium (those who resold it and were therefore exempt from assessment) may seem, to plaintiffs, equally to have benefited from the enrichment services, we cannot conclude that Congress's decision to target end-users was without rational basis. And although plaintiffs may have preferred a system under which USEC's post–1992 customers likewise picked up the tab, Congress's assignment of liability for a past problem to past consumers does not stretch the limits of the reasonable.

Accordingly, plaintiffs' equal protection challenge, like its takings and due process claims, must fail.

## CONCLUSION

In apportioning the costs of modern life, Congress must often determine which expenses should properly be seen as liabilities belonging to society as a whole, and which should instead be treated as obligations of a smaller subset of the population. Congress could reasonably have determined that plaintiffs, along with other recipients of government-enriched uranium, were the beneficiaries of the process through which the uranium plants became contaminated. The fact that plaintiffs may not have caused the contamination, and indeed may simply have received a benefit from uranium plants long-contaminated before plaintiffs' arrival on the scene, does not diminish their accountability. The burden imposed on plaintiffs by the Energy Policy Act is not impermissibly substantial, nor unduly retroactive, nor unacceptably divorced from plaintiffs' experience with the program so as to violate any constitutional mandate. Plaintiffs have suffered

no unconstitutional taking nor other unlawful exaction of their funds. We therefore grant defendant's motion to dismiss and direct the entry of judgment accordingly.