271 F.3d 1357 (Fed. Cir. 2001)
 MAINE YANKEE ATOMIC POWER COMPANY, Plaintiff-Appellant,
v.
UNITED STATES, Defendant-Appellee.
SACRAMENTO MUNICIPAL UTILITY DISTRICT, Plaintiff-Appellant,
v.
UNITED STATES, Defendant-Appellee.
OMAHA PUBLIC POWER DISTRICT, Plaintiff-Appellant,
v.
UNITED STATES, Defendant-Appellee.
 99-5156, 99-5158, 99-5160
 United States Court of Appeals for the Federal Circuit
 DECIDED: NOVEMBER 20, 2001
 
 Appealed from: United States Court of Federal Claims, Judge John P. WieseJerry Stouck, Spriggs & Hollingsworth, of Washington, DC, argued for plaintiff-appellant in 99-5159. With him on the brief were Rebecca A. Womeldorf, and Michael R. Miner.
 Melvin C. Garbow, Arnold & Porter, of Washington, DC, argued for plaintiff-appellant in 99-5158. With him on the brief were Howard N. Cayne, Kent A. Yalowitz, and Edward H. Sisson.
 Robert A. Mangrum, Winston & Strawn, of Washington, DC, argued for plaintiff-appellant in 99-5160. With him on the brief were Eric J. Marcotte, and Charles B. Klein.
 James G. Bruen, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department, of Washington, DC, argued for defendant-appellee in 99-5156, 99-5158, and 99-5160. On the briefs were J. Christopher Kohn, Director; Sandra P. Spooner, Deputy Director; Theodore R. Carter, III, and Margaret L. Baskette, Attorneys.
 Before MAYER, Chief Judge, FRIEDMAN, Senior Circuit Judge, and GAJARSA, Circuit Judge.
 PER CURIAM.
 
 
 1
 In the Energy Policy Act of 1992, Congress imposed liability upon nuclear electric power companies that had purchased enriched uranium from the United States -- the purchases having been made as far back as 1969 -- for a substantial portion of the government's costs of decontaminating the plants in which it had enriched the uranium. The three appellants -- electric utilities that had purchased enriched uranium from the government for their nuclear power plants and who were subject to, and had paid part of, the statutory liability -- sued the United States in the Court of Federal Claims, challenging the assessments as a taking of their property for which they sought just compensation and as an unconstitutional retroactive statutory application that denied them due process and equal protection. On the government's motion, the Court of Federal Claims dismissed the complaints, holding that they did not set forth valid constitutional claims.
 
 
 2
 In Commonwealth Edison Co. v. United States, No. 00-5069, also decided today, this court en banc has upheld the constitutionality of that statutory assessment against similar challenges, namely that it takes the property of another utility and denies that utility due process. That decision binds this panel, and requires us to reject the utilities' taking and due process arguments in the instant case.
 
 
 3
 Two of the utilities in this case, Maine Yankee Atomic Power Company and Sacramento Municipal Utility District, also argue that the statute denies them equal protection -- a contention not made in Commonwealth Edison. As the Court of Federal Claims stated, the utilities argued that "the fact that foreign utilities were exempted from the assessment impermissibly differentiates between similarly-situated entities -- i.e., all those that had consumed government-enriched uranium. In addition, plaintiffs contend, the Act draws an illegitimate distinction between purchasers who resold the uranium, and those who kept it for their own purposes, as well as between pre-1992 consumers (who are subject to the fee) and post-1992 consumers (who are exempt)." Maine Yankee Atomic Power Co. v. United States, 44 Fed. Cl. 372, 383 (1999).
 
 
 4
 The Court of Federal Claims correctly rejected those contentions. We rely upon and accept that court's reasoning:
 
 
 5
 With regard to Congress's decision to exempt foreign utilities from liability, we refer to the Supreme Court's observation in Barclay & Co. v. Edwards, 267 U.S. 442, 451 (1924) that "[c]onsiderations of policy toward foreign countries may very well justify an exemption of the foreign corporations from taxes that might legitimately be imposed on them, but which Congress does not think it wise to exact." In addition, we think it significant that, as defendant points out in its motion to dismiss, the exclusion of foreign utilities from the liability equation in no way increases or otherwise affects plaintiffs' portion of domestic utility usage.
 
 
 6
 Similarly, legislatures need not burden the most responsible party to survive rational basis review. Association of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1255-56 (D.C. Cir. 1998). While the original purchasers of uranium (those who resold it and were therefore exempt from assessment) may seem, to plaintiffs, equally to have benefited from the enrichment services, we cannot conclude that Congress's decision to target end-users was without rational basis. And although plaintiffs may have preferred a system under which USEC's post-1992 customers likewise picked up the tab, Congress's assignment of liability for a past problem to past consumers does not stretch the limits of the reasonable.
 
 
 7
 Id.
 
 
 8
 The judgments of the Court of Federal Claims dismissing the complaints are
 
 
 9
 AFFIRMED.
 
 
 10
 * * * * *
 
 
 11
 Concurring opinion of FRIEDMAN, Senior Circuit Judge, in which MAYER, Chief Judge, joins.
 
 
 12
 Since I agree that we are bound by Commonwealth Edison and also agree with the court's rejection of the equal protection contention, I join in the opinion and judgment of the court. If I were not bound by Commonwealth Edison, however, I would hold that the retroactive assessment denies the appellants due process. My reasons for that conclusion follow.
 
 
 13
 * A. During World War II, the United States began enriching uranium, first for military purposes and, starting in the mid-1960s, as nuclear fuel for commercial generation of electricity, which it sold to domestic and foreign utilities. Maine Yankee Atomic Power Co. v. United States, 44 Fed. Cl. 372, 374 (1999). The government sold the enriched uranium under fixed price contracts, which did not authorize the government to collect any additional amounts. Id. The decontamination and decommissioning of these polluted facilities is expected to take 40 years and to cost up to $20 billion. Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1572 (Fed. Cir. 1997).
 
 
 14
 Congress dealt with this problem in the Energy Policy Act of 1992 ("the Act" or "the Energy Act"). See generally id. That was comprehensive legislation designed to implement a "national energy policy," a reaction, at least in part, to the adverse economic effects of an oil embargo associated with the military conflict in the Persian Gulf. H.R. Rep. No. 102-474(I), at 132 (1992), reprinted in 1992 U.S.C.C.A.N. 1954, 1955.
 
 
 15
 In this legislation, Congress sought to "reform the current uranium enrichment program of the [government] so that it will be operated in a more business-like fashion." H.R. Rep. No. 102-474(I), at 142 (1992), reprinted in 1992 U.S.C.C.A.N. 1954, 1965. The Act established the United States Enrichment Corporation ("Enrichment Corporation") as a government corporation to assume the operation of the government's uranium enrichment services, 42 U.S.C. 2297, and "which eventually could be sold to the private sector." H.R. Rep. No. 102-474(I), at 142-43 (1992), reprinted in 1992 U.S.C.C.A.N. 1954, 1965-66. The Act required that the Enrichment Corporation "[w]ithin 2 years prepare a strategic plan for transferring ownership of the Corporation to private investors." 42 U.S.C. 2297d(a). The "key purposes of the Corporation includ[ed] providing enrichment services in a business-like fashion, maximizing the economic return to the [government]." H.R. Rep. No. 102-474(I), at 198 (1992), reprinted in 1992 U.S.C.C.A.N. 1954, 2021.
 
 
 16
 The Act provided that the Enrichment Corporation would not be liable for the costs of cleaning up and closing the government's uranium enrichment facilities. 42 U.S.C. 2297c-2(d). Instead, the Act established the Uranium Enrichment Decontamination and Decommissioning Fund ("Fund") for that purpose. 2297g. The Fund is financed through both Congressional appropriations and an assessment on those domestic utilities that purchased and used government enriched uranium. 2297g-1(b).
 
 
 17
 The Fund is instructed to obtain up to $480 million per year (to be adjusted annually for inflation), with at most $150 million from a special assessment on the domestic utilities. 2297g-1(a), (c). That assessment is based on each utility's share of the government's enriched uranium sales (whether purchased directly from the government or from another source), which were made prior to October 24, 1992 and that it did not resell. 2297g-1(c). The special assessment terminates after 15 years or after $2.25 billion has been collected. 2297g-1(e).
 
 
 18
 The Act also provided that the special assessments "shall be deemed a necessary and reasonable current cost of fuel and shall be fully recoverable in rates in all jurisdictions in the same manner as the utility's other fuel cost." 42 U.S.C. 2297(g)-1(g).
 
 
 19
 B. The three appellants filed separate complaints in the Court of Federal Claims, as did a number of other similarly-situated electric utilities. They contend that the special assessment constituted a breach of the fixed-price contract under which they had purchased enriched uranium from the government. The complaints included the following factual allegations, which we accept for purposes of the government's motions to dismiss. Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States, 48 F.3d 1166, 1169-70 (Fed. Cir. 1995) ("[W]e assume that all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the movant.").
 
 
 20
 The appellants -- Maine Yankee Atomic Power Company ("Maine Yankee"), Sacramento Municipal Utility District ("Sacramento District"), and Omaha Public Power District ("Omaha District") (collectively "the Utilities") -- all operated nuclear power plants and purchased government-produced enriched uranium before 1992. Thus, as domestic utilities that purchased and used government provided enriched uranium, each is liable for a portion of the Act's special assessment, and each has paid millions of dollars.
 
 
 21
 The Utilities also allege that the government completely contaminated its enrichment facilities (buildings, equipment, property, and surrounding property) prior to 1969, at a time when they were used almost exclusively for defense purposes. Little, if any, additional contamination occurred after 1969, when these facilities were used to enrich uranium for sale to commercial utilities.
 
 
 22
 Maine Yankee is a domestic utility that operated a single nuclear power plant, which was permanently closed in 1996. It purchased enriched uranium from the government from 1970 to 1986 under two contracts, one executed on October 2, 1970 and the other on November 4, 1982. On its purchases of government enriched uranium, Maine Yankee is subject to a $25 million special assessment, of which it has paid more than $9.8 million.
 
 
 23
 Sacramento District is a municipal utility district in California that generates electricity and operated a nuclear generating facility, which it closed in 1989. During the operation of that facility, the Sacramento District purchased enriched uranium from the government, beginning in 1969 and ending in 1981. In 1990, the Sacramento District terminated its contract for purchasing enriched uranium. Because of those purchases, Sacramento District has paid $5.8 million in special assessments and expects its total liability to reach $8 million.
 
 
 24
 Omaha District is a domestic utility that generates and supplies electricity in Nebraska. It purchased enriched uranium from the government between 1969 and 1992 under two contracts. Omaha District has paid special assessments of more than $7.4 million, and estimates its total liability to be nearly $20 million.
 
 
 25
 One of the other utilities that filed such a suit in the Court of Federal Claims was Yankee Atomic Electric Company. That court granted Yankee Atomic summary judgment, holding that "the assessment imposed upon Yankee Atomic to fund clean-up costs constitutes an unlawful exaction because it violates the Government's earlier contractual agreements to supply enriched uranium at fixed prices." Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1571 (Fed. Cir. 1997). On the government's appeal, we reversed. Id. We held that the special assessment did not constitute a retroactive increase of the contract price, id. at 1575, but instead "constitutes a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services," id. at 1577.
 
 
 26
 After our decision in Yankee Atomic, the Utilities amended their complaints to assert claims not addressed in Yankee Atomic; namely, that the assessment was a taking of their property and denied them due process in violation of the Fifth Amendment. Maine Yankee and the Sacramento District also asserted that the assessment denied them equal protection.
 
 
 27
 On the government's motion, the Court of Federal Claims granted summary judgment dismissing the complaints for failure to state a claim upon which relief could be granted. Maine Yankee Atomic Power Co. v. United States, 44 Fed. Cl. 372 (1999); Omaha Pub. Power Dist. v. United States, 44 Fed. Cl. 383 (1999); Sacramento Mun. Util. Dist., 44 Fed. Cl. 395 (1999).
 
 
 28
 In an opinion dealing with the three cases (but issued separately for each case), the court first held that Yankee Atomic was not stare decisis on the constitutional issues the Utilities raised. Maine Yankee, 44 Fed. Cl. at 376-77. In holding that the complaints did not state a valid takings claim, the court concluded that none of the factors in "a traditional takings analysis . . . -- the economic impact of the legislation, the reasonableness of plaintiffs' investment-backed expectations and the character of the government action -- support the finding of a taking of property." Id. at 381. The court rejected the Utilities' due process claim based on the retroactivity of the assessment. Id. at 379-80. The court concluded its discussion of these issues with the following statement:
 
 
 29
 Whether we analyze the assessment under the Due Process Clause, under the Takings Clause, or under some amalgam of the two, we are, in the end, faced with a single, basic question: Is it inherently unfair, unjust, or irrational for Congress, when faced with costs resulting from the enrichment of uranium, to ask those parties who received the uranium to contribute to the solution? The answer, quite clearly, is no. Plaintiffs' assessments are directly proportional to their usage of uranium enrichment services - the very services which created the contamination. Congress itself took responsibility for more than two thirds of the clean-up costs and assigned the rest, as a general tax, to the rate-payers in districts which had previously benefited from nuclear power. Such a scheme can hardly be construed as beyond the reach of fairness or rationality.
 
 
 30
 Id. at 382-83.
 
 
 31
 Finally, the court rejected the claim that the special assessment denied Maine Yankee and the Omaha District equal protection because it did not cover (1) foreign utilities or (2) utilities that purchased but resold government-enriched uranium. The court denied this claim since "legislatures need not burden the most responsible party to survive rational basis review." Id. at 383 (citing Ass'n of Bituminous Contractors, Inc. v. Apfel, 156 F.3d 1246, 1255-56 (D.C. Cir. 1998)).
 
 II
 
 32
 A. The Supreme Court has noted that "the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted." Landgraf v. USI Film Prods., 511 U.S. 244, 265 (1994) (footnotes omitted). When the retroactivity is severe, the legislation may violate the Due Process Clause. See United States v. Carlton, 512 U.S. 26, 32 (1994) (concluding that the application of a 1987 federal tax statute to a 1986 transaction did not violate due process in part because "Congress acted promptly and established only a modest period of retroactivity."); see also id. at 38 (O'Connor, J., concurring) ("A period of retroactivity longer than the year preceding the legislative session in which the law was enacted would raise, in my view, serious constitutional questions."). In exceptional circumstances not involving tax law, however, longer retroactivity has been held not to deny due process. See Usery v. Turner Elkhorn Mining Co., 428 U.S. 1 (1976), discussed in Part III B below.
 
 
 33
 Another pertinent principle is that economic legislation has a presumption of constitutionality, which may be overcome by demonstrating that the legislation is arbitrary or irrational. Turner Elkhorn, 428 U.S. at 15 (noting that "legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way" (citing, for example, Ferguson v. Skrupa, 372 U.S. 726 (1963); Williamson v. Lee Optical Co., 348 U.S. 483, 487-88 (1955)). Thus, to prevail here, the Utilities must demonstrate that the Act is arbitrary and irrational as applied to them. They have carried that burden.
 
 
 34
 The special assessment was wholly retroactive: it covered only purchases of enriched uranium before the effective date of the Act. The retroactivity was severe. It reached back to the Utilities' enriched uranium purchases that occurred up to twenty-two years (or twenty-three years, in the case of Omaha District) before the Act was passed, six years after Maine Yankee had stopped purchasing government enriched uranium, and three years after Sacramento District closed its plant. It also wassubstantial, subjecting the Utilities to additional charges which they assert would total $25 million, $8 million and almost $20 million for the three companies.
 
 
 35
 The Utilities did not cause or contribute to the contamination of the government's plants, which the special assessment was designed to cure, and did not benefit from it. The Utilities allege that the contamination occurred prior to the beginning of their purchases, when the plants were producing enriched uranium "almost exclusively" for the military, and that "[l]ittle, if any additional contamination" occurred thereafter. Moreover, when the Utilities entered into the purchase contracts at a fixed price, they had no reason to believe, or even suspect, that years later the government would seek to make them pay for a substantial portion of its cleanup costs. They may well have understood and expected that the government would incur substantial expenses in making that cleanup, but they reasonably would have believed that the charges the government made for the enriched uranium included the cleanup cost. They certainly had no basis to expect that they would be subject to the additional large amounts of the assessments.
 
 
 36
 To be sure, the Utilities benefited from their participation in the government's uranium enrichment program, but the plant contamination and the cost of cleaning it up arose from an earlier stage of that program (when the Utilities were not participants). For the reasons just given, however, the Utilities' participation is not a sufficient basis under the Due Process Clause to subject the Utilities to such a substantial portion of the costs of cleaning up the contamination, which they did not cause and from which they did not benefit.
 
 
 37
 B. The government contends that Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 24 (1976), supports the retroactive assessment against the Utilities. Turner Elkhorn involved a provision of the Federal Coal Mine Health and Safety Act of 1969, 83 Stat. 792, as amended by the Black Lung Benefits Act of 1972, 86 Stat. 150, 30 U.S.C. 901 et seq., that required mining companies to pay death or total disability benefits to employee miners suffering from pneumoconiosis (black lung disease), as applied to miners who had stopped so working before the effective date of the Act. The disease, whose symptoms may "become apparent only after a miner has left the coal mines," id. at 8, "is caused by long-term inhalation of coal dust," id. at 6. The mining companies challenged this retroactive application of the Act as violating due process.
 
 
 38
 The Supreme Court upheld the Act against this challenge. The Court recognized that the legislation imposed new liability for disabilities developed prior to enactment, but concluded that such retroactivity was "justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor." Id. at 18. It reflected the "interlocking economic rights and duties of employers and employees," and "adjust[ed] the burdens and benefits of economic life." Id. at 15. Thus, Turner Elkhorn held that it was not a due process violation for legislation "to satisfy a specific need created by the dangerous conditions under which the former employee labored -- to allocate to the mine operator an actual, measurable cost of his business." Id. at 19.
 
 
 39
 The Court, however, in sustaining the presumptions of the Coal Act relating tototal disability, which were also at issue in the case, stated: "To the extent that the presumption of death due to pneumoconiosis is viewed as requiring compensation for damages resulting from death unrelated to the operator's conduct, its application to employees who terminated their employment before the Act was passed would present difficulties not encountered in our prior discussion of retroactivity. The justification we found for the retrospective application of the Act is that it serves to spread costs in a rational manner -- by allocating to the operator an actual cost of his business, the avoidance of which might be thought to have enlarged the operator's profits. The damage resulting from a miner's death that is due to causes other than the operator's conduct can hardly be termed a 'cost' of the operator's business." Id. at 24; see also Concrete Pipe and Prods. v. Constr. Laborers Pension Trust, 508 U.S. 602, 641 (1993); United States v. Carlton, 512 U.S. 26, 31 (1994). Thus, in Turner Elkhorn, the Supreme Court recognized culpability as an important factor supporting the imposition of retroactive liability.
 
 
 40
 There is a critical difference between Turner Elkhorn and the present case that precludes the application of Turner Elkhorn here. In Turner Elkhorn the miners' illness was caused by conditions that existed when they were working for the company, for which it was responsible and which "profited from the fruits of their labor." The company, therefore, could fairly be charged with responsibility for its former employees' condition.
 
 
 41
 In the present case, however, the contamination occurred before the government sold enriched uranium to the Utilities, which neither were responsible for nor benefited from the contamination. In these circumstances, as shown, it would be unfair and unreasonable to subject the Utilities to a substantial additional charge to cure the contamination they neither caused nor benefited from.
 
 
 42
 In many (if not most) of the cases in which the Supreme Court rejected Due Process challenges to retroactive legislation, the statute dealt with the relationships, financial and otherwise, among private parties; the government's role was only the regulation of those relationships. In the present case, however, the statute deals with the relationship between the government and private parties; it seeks to transfer to those parties a substantial portion of the government's costs of rectifying the contamination of its plants used to produce the product it sold to those parties. It is by no means clear that those Supreme Court cases may be automatically and uncritically applied to the significantly different situation here involved.
 
 
 43
 C. The government contends that the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("Environmental Response Act"), 42 U.S.C. 9601 et seq. (1994), supports the validity under the Due Process Clause of the retroactive assessment of clean-up costs on the Utilities. Among other things, that Act provides for the clean-up of inactive hazardous waste disposal sites and established a Hazardous Substances Response Trust Fund ("Superfund") to pay for it. The Superfund was funded initially, and in large part, by special taxes on certain petroleum products and chemicals and was to be replenished by assessments on persons responsible for the waste. Hazardous Substance Response Revenue Act of 1980, Title II, Subtitle A 4611, 4661, Title II, Subtitle B, 221, 26 U.S.C. 4611, 4661, 42 U.S.C. 9631. The government used the Superfund to fund the clean-up and replenished the cost by charging the persons responsible for the hazardous waste. 45 U.S.C. 9604(a)(1), 9607. Such responsible persons include those involved in the cleanup work, including "the owner and operator of . . . a facility," anyone who at the time of disposal "owned or operated any facility at which such hazardous substances were disposed of," anyone who arranged for or participated in the "transport for disposal or treatment, of hazardous substances" and anyone who "accepted any hazardous substances for transport to disposal treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance." 42 U.S.C. 9607(a).
 
 
 44
 The Environmental Response Act thus retroactively imposes liability on numerous persons for cleanup of pre-enactment contamination.
 
 
 45
 The government cites two Court of Appeals cases that upheld the retroactive application of the Environmental Response Act against Due Process challenges to its constitutionality, as support for the constitutionality of the retroactive assessment against the Utilities. United States v. Northeastern Pharm. & Chem. Co., 810 F.2d 726 (8th Cir. 1986), held liable for cleanup costs individuals who arranged for the transportation and dumping of hazardous waste before the effective date of the Act. In United States v. Monsanto Co., 858 F.2d 160, 174 (4th Cir. 1988), the court ruled that retroactive application of the Environmental Response Act did not violate due process as applied to (1) landowners who leased their property to a company that stored hazardous waste on the land and (2) the companies that generated the waste but which contracted with another waste-handling business, which provided transportation, recycling and disposal of chemical waste. Noting that the companies that generated the waste "profited from inexpensive waste disposal methods that may have been technically 'legal' prior to the [Environmental Response Act]'s enactment, it was certainly foreseeable at the time that improper disposal could cause enormous damage to the environment. [The Environmental Response Act] operates remedially to spread the costs of responding to improper waste disposal among all parties that played a role in creating the hazardous conditions . . . . [T]he retroactive application of [the Environmental Response Act] does not violate due process." Id. at 174 (citations omitted).
 
 
 46
 In the present case, however, the Utilities did not participate in any way, directly or indirectly, or play any role in, the creation of the hazardous conditions at the government's uranium facilities. The Utilities merely purchased enriched uranium after the contamination had occurred, long before the passage of the Energy Act. The Utilities' tangential connection with the contamination of the government's uranium enrichment facilities is quite different from the relationships to the hazardous waste disposal of the persons held constitutionally liable under the Environmental Response Act.
 
 
 47
 D. The government also contends that because 42 U.S.C. 2297g-1(g) provides that the assessments "shall be deemed a necessary and reasonable current cost of fuel and shall be fully recoverable in rates in all jurisdictions in the same manner as the utility's other fuel cost," the Utilities will be able to pass the assessments on to their customers, and that the assessments, therefore, will not have any substantial economic impact on them.
 
 
 48
 It is impossible to predict, however, to what extent (if any) state and local regulatory agencies and courts would permit the Utilities to treat the assessments as a "current cost of fuel" in determining their rates. The question whether 2297g-1(g) preempts state regulatory authority in this area appears difficult. The power of Congress to require that particular items be included in the Utilities' costs for rate making purposes is uncertain. Regulation of retail electric power rates is a traditional function of state government. The likelihood of the state action that the government envisions is far too speculative and conjectural to constitute a valid basis for upholding the assessments.
 
 
 49
 In any event, the question whether, and to what extent, the state regulatory agencies and courts will recognize the assessment as part of the Utilities' costs for rate making purposes appears more appropriately an issue for the damages phase of these cases than for the liability phase.
 
 
 50
 E. In sum, I conclude that the Utilities' complaints have stated a valid claim under the Due Process Clause, and that the Court of Federal Claims erred in dismissing the complaints for failure to state a claim upon which relief could be granted.