**UNION ELECTRIC COMPANY,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5096.

United States Court of Appeals,
Federal Circuit.

April 2, 2004.

Jonathan S. Martel, Arnold & Porter, of Washington, DC, argued for plaintiff-appellant. With him on the brief was Howard N. Cayne.

James G. Bruen, Jr., Special Litigation Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General; and J. Christopher Kohn, Director. Of counsel on the brief was Marc E. Kasischke, Attorney, Office of General Counsel, United States Department of Energy, of Washington, DC.

Before CLEVENGER, RADER and DYK, Circuit Judges.

DYK, Circuit Judge.

This case presents, once again, questions concerning the constitutionality of the Energy Policy Act of 1992, Pub.L. No. 102–486, 106 Stat. 2776 (codified as amended in various sections of 42 U.S.C.) ("EPACT"). EPACT imposes special monetary assessments on domestic utility companies that have purchased government-enriched uranium for the purpose of commercial electricity generation, 42 U.S.C. § 2297g–1(c) (2000). In three previous decisions we rejected claims for recovery of EPACT assessments based on theories that (a) the assessments violated prior contracts between the utilities and the government and constituted takings of those contract rights, *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569 (Fed. Cir.1997), *cert. denied*, 524 U.S. 951, 118 S.Ct. 2365, 141 L.Ed.2d 735 (1998); (b) the assessments constituted takings or violated due process under the Fifth Amendment, *Commonwealth Edison Co. v. United States*, 271 F.3d 1327 (Fed.Cir.2001) (*en banc*), *cert. denied*, 535 U.S. 1096, 122 S.Ct. 2293, 152 L.Ed.2d 1051 (2002); and (c) the assessments violated the equal protection component of the Due Process Clause, *Maine Yankee Atomic Power Co. v. United States*, 271 F.3d 1357 (Fed.Cir. 2001), *cert. denied*, 535 U.S. 1095, 122 S.Ct. 2290, 152 L.Ed.2d 1049 (2002). This case presents the question whether the assessments constitute unconstitutionally unapportioned direct taxes. This issue was raised in passing in *Maine Yankee*, but we did not address it in deciding the case. We hold that stare decisis does not foreclose our review of the direct tax question, but on the merits we hold that the EPACT special assessments are not direct taxes and do not therefore require apportionment in accordance with the Direct Tax Clauses of the Constitution, U.S. Const. art. I, § 2, cl. 3; *id.* art. I, § 9, cl. 4. We therefore affirm the Court of Federal Claims' decision in *Union Elec. Co. v. United States*, No. 96–674C, slip op. at 6–7 (Fed.Cl. Jan. 30, 2003).

## BACKGROUND

We have considered in detail the history and purpose of EPACT in our prior cases. *See Yankee Atomic*, 112 F.3d at 1572–73; *Commonwealth Edison*, 271 F.3d at 1332–34; *Maine Yankee*, 271 F.3d at 1360–61 (Friedman, J., concurring). Suffice it to say for present purposes that "Congress in EPACT addressed the need to decontaminate and decommission the government's uranium enrichment facilities ... the costs [of which] were to be shared by the government and those 'domestic utilities that benefited from processing [of uranium] at government facilities." *Commonwealth Edison*, 271 F.3d at 1333. The Act provided that, to this end, "a special assessment [would be collected] from domestic utilities" that "purchased [enriched uranium] from the Department of Energy for the purpose of commercial electricity generation, before October 24, 1992." 42 U.S.C. § 2297g–1(c).[1]

The special assessment imposed on a particular utility was based on the percentage of the total number of government-produced separative work units ("SWU") (the measurement unit used to quantify government enrichment services) that the utility purchased.[2] The Act further explained that "a utility shall be considered to have purchased a separative work unit from the Department if [it] was produced by the Department, but purchased by the utility from another source" as long as the utility had not resold the government-enriched uranium before October 24, 1992.

*Id.* § 2297g–1(c)(1)–(2). In other words, as to those utilities that submitted the uranium to the government for processing, the tax was effectively imposed on their utilization of the government enrichment services. *See Commonwealth Edison*, 271 F.3d at 1333. With respect to companies that purchased already-enriched uranium from those that had utilized the government enrichment services, the tax was effectively imposed on their purchase of the enriched uranium. The net effect of the statute was to tax domestic utility purchasers, but it did not apply to (1) foreign utility purchasers of government-enriched uranium; (2) domestic utilities that purchased enriched uranium from foreign sources; (3) domestic utilities that sold their government-enriched uranium prior to October 24, 1992; and (4) domestic utilities that purchased government-enriched uranium after October 24, 1992. *See id.* Finally, EPACT specified that the collection of special assessments would cease after "the earlier of ... 15 years after October 24, 1992; or ... the collection of $2,250,000,000." 42 U.S.C. § 2297g–1(e).

The relevant facts in this case are not in dispute. Union Electric is a Missouri corporation that operates various electricity-generating facilities. Prior to October 24, 1992, Union Electric owned government-enriched uranium that it had purchased both directly from the government and on the secondary market. Union Electric was liable for special assessments under EPACT, and it paid a total of

1. The statute addressing special assessments reads:

> The Secretary shall collect a special assessment from domestic utilities. The total amount collected for a fiscal year shall not exceed $150,000,000.... The amount collected from each utility ... for a fiscal year shall be in the ratio ... as the total amount of separative work units such utility has *purchased from the Department of Energy for the purpose of commercial electricity genera-*

> *tion,* before October 24, 1992, bears to the total amount of separative work units purchased from the Department of Energy for all purposes ... before October 24, 1992.

42 U.S.C. § 2297g–1(c) (emphasis added).

2. An SWU measures "the amount of energy required for the enrichment of each utility's uranium." *Fla. Power & Light Co. v. United States*, 307 F.3d 1364, 1372 (Fed.Cir.2002).

$14,436,240.51 in special assessments as of the date the complaint was filed. In October of 1996 Union Electric filed a complaint in the Court of Federal Claims, claiming that it was entitled to a refund of these EPACT special assessments on a variety of theories. The Court of Federal Claims stayed the proceedings in Union Electric's case pending the outcomes in *Yankee Atomic, Commonwealth Edison*, and *Maine Yankee*.

Following our resolution of these three cases, Union Electric filed an amended complaint in the Court of Federal Claims, where it asserted seven grounds for invalidation of the EPACT special assessments, including a claim that the special assessments violated the Direct Tax Clauses of the Constitution.[3] Union Electric claimed that the EPACT special assessments were direct taxes and therefore unconstitutional because they were not apportioned as required by sections 2 and 9 of Article I. The government filed a motion to dismiss, and the Court of Federal Claims dismissed the complaint in its entirety, finding that all the claims were governed by our court's opinions in *Yankee Atomic, Commonwealth Edison*, and *Maine Yankee*.[4] The Court of Federal Claims held that stare decisis barred it from deciding the direct tax claim even though it had not been explicitly decided in the prior opinions. The court stated:

> It is true that no Federal Circuit decision has unambiguously announced a ruling denying the unapportioned direct tax claim argued by plaintiffs. The [EPACT special assessments] litigation, however, has encompassed dozens of lawsuits, offering a spectrum of constitutional arguments against EPACT. Those arguments, including the direct tax challenge at issue here, were heard in turn by the Federal Circuit which did not regard the issue as dispositive. It cannot be assumed that the Federal Circuit has chosen to base the resolution of this complicated litigation on an unconstitutional act.... This court holds that a better reading of *Commonwealth Edison, Yankee Atomic*, and *Maine Yankee* forecloses any suit predicated on an unapportioned direct tax challenge.

*Union Elec.*, slip op. at 6–7.

Union Electric appeals the dismissal of its direct tax claim. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

■ We review the Court of Federal Claims' dismissal without deference. *See First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1286–87 (Fed.Cir.1999).

### I

■ The first question we address is whether consideration of the direct tax issue is foreclosed by our earlier decisions. We hold that it is not.

The Court of Federal Claims declined to consider the direct tax challenge, finding

---

3. The relevant constitutional provisions read as follows:

Representatives and direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers.... U.S. Const., art. I, § 2, cl. 3.

No Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken.
*Id.* art. I, § 9, cl. 4.

Duties, Imposts and Excises shall be uniform throughout the United States.
*Id.* art. I, § 8, cl. 1.

4. Union Electric's complaint also raised a claim that the EPACT tax violated the Ex Post Facto Clause of the Constitution. The Court of Federal Claims rejected this claim based on the Supreme Court's decision in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798). *Union Elec.*, slip op. at 4.

that it was implicitly decided by our earlier EPACT decisions because the "[Federal Circuit] court grounded its approval of EPACT assessments on the theory that those assessments are taxes.... It is indeed untenable to assert that the court would issue that holding without simultaneously considering whether such taxes are constitutional." *Union Elec.*, slip op. at 6. However, the direct tax issue was not specifically argued in *Yankee Atomic* or *Commonwealth Edison.*

In *Yankee Atomic* we considered whether the EPACT tax breached the domestic utilities' contracts with the government by "retroactively increasing the price [of] previously supplied uranium enrichment services," 112 F.3d at 1573, and whether the assessments constituted takings of the utilities' contract rights, *see id.* at 1580 n. 8. We held that the special assessments did not breach domestic utilities' prior contracts with the government because these contracts "did not include an unmistakable promise that precluded the Government from later imposing an assessment upon all domestic utilities that employed the DOE's uranium enrichment services." *Id.* at 1580. We also concluded that Yankee Atomic's takings claim failed because the lack of an "unmistakable promise" against future assessments meant that "Yankee Atomic had no property right (via a vested contract right) which was subsequently taken by the assessment." *Id.* at 1580 n. 8.

So too, we affirmed the constitutionality of the EPACT assessments in our en banc decision in *Commonwealth Edison* without considering the direct tax issue. The tax was challenged as violating Edison's con-

tracts with the government as well as the Takings Clause and the Due Process Clause of the Fifth Amendment. We rejected Edison's contract claims, relying on *Yankee Atomic. Commonwealth Edison,* 271 F.3d at 1341. We held that the special assessments did "not constitute a Fifth Amendment taking because the Takings Clause does not apply to legislation requiring the payment of money." *Id.* at 1329. Finally, we held that the EPACT tax did not violate the Due Process Clause despite its retroactive effect because the retroactive character of the tax furthered the "legitimate legislative objective" to decontaminate uranium processing facilities; because Congress' findings that domestic utilities had benefited from the enrichment services and had contributed to the contamination were reasonable conclusions; because Congress did not impose the entire decontamination costs on the domestic utilities; and because the domestic utilities "could have reasonably expected" to incur liability for the government's decontamination costs. *Id.* at 1330.

In *Maine Yankee* we again upheld the constitutionality of the EPACT assessments. We held that the EPACT assessments did not violate the Equal Protection Clause, rejecting the utility companies' argument that the foreign utility exemption of the statute unconstitutionally disadvantaged them. *Maine Yankee,* 271 F.3d at 1359. Although the direct tax issue was raised as a ground for appeal in *Maine Yankee,* it was not addressed in our opinion, and there is a question as to whether the argument was properly raised in the Court of Federal Claims.[5] *See Union Elec.*, slip op. at 6.

---

5. The complaint did not raise the direct tax issue. At oral argument in the Court of Federal Claims, counsel for the appellant, Sacramento Municipal Utility District, appeared to admit that the issue had not been properly raised. He suggested the direct tax argument at oral argument in the Court of Federal Claims and explained: "I'm reluctant to thrust this on the Court because it's a little half-baked. We haven't had a chance to brief it to the Court and we're catching [Government counsel] by surprise, and I apologize for

Even if *Maine Yankee* were viewed as implicitly rejecting the direct tax argument, we have repeatedly held that the disposition of an issue by an earlier decision does not bind later panels of this court unless the earlier opinion explicitly addressed and decided the issue. *See, e.g., Boeing N. Am., Inc. v. Roche,* 298 F.3d 1274, 1282 (Fed.Cir.2002). Supreme Court precedent also supports this limitation on stare decisis. *See Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 232 n. 6, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) ("[T]he unexplained silences of our decisions lack precedential weight."); *Brecht v. Abrahamson,* 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (holding that stare decisis did not apply, and the Court was "free to address the issue on the merits" because its prior case law never squarely addressed the issue, and at most assumed the applicability of the ... standard in question).

■ In the circumstances of this case, we conclude that it is appropriate to decide the merits without remand. The issues are purely legal and require no fact-finding by the Court of Federal Claims. Both parties urge us to decide on the merits, and having received briefing and argument on the constitutional question, it will conserve judicial resources to decide the merits at this time. Thus, this panel will address Union Electric's direct tax challenge on the merits.

## II

■ Although our prior case law has definitively established that the EPACT special assessments are properly charac-

terized as taxes, *Commonwealth Edison,* 271 F.3d at 1340, *Yankee Atomic,* 112 F.3d at 1575, we conclude that the EPACT tax is not a form of direct tax. Rather, the EPACT tax is an excise tax.

The direct tax provisions appear in Article I of the Constitution. Section 2, clause 3 provides that "direct Taxes shall be apportioned among the several States which may be included within this Union, according to their respective Numbers." U.S. Const., art. I, § 2, cl. 3. In section 9, clause 4, the Constitution elaborates on the direct tax requirements, explaining that "[n]o Capitation, or other direct, Tax shall be laid, unless in Proportion to the Census or Enumeration herein before directed to be taken." *Id.* art. I, § 9, cl. 4. The Constitution treats excise taxes differently, stating that "Duties, Imposts and Excises shall be uniform throughout the United States." *Id.* art. I, § 8, cl. 1. Neither the record of the constitutional convention nor the state ratification debates defines with any clarity the meaning of the term "direct tax" in the context of personal property. *See* Bruce Ackerman, *Taxation & the Constitution,* 99 Colum. L.Rev. 1, 9–11 (1999); *see also* 2 *The Records of the Federal Convention of 1787,* at 350 (Max Farrand ed., Yale Univ. Press, 1966) (Aug. 20, 1787) ("Mr. King [a delegate to the constitutional convention] asked what was the precise meaning of direct taxation? No one answ[ere]d."). Over the years, litigants have frequently challenged specific taxes as unapportioned direct taxes in violation of Article I, sections 2 and 9. The Constitution's contrast of direct taxes with excise taxes has generally provided the framework for constitutional analysis in this area.[6]

---

that." Oral Argument Transcript, *Maine Yankee,* Nos. 97–28C, 95–823C, 96–616C, at 82 (Fed.Cl. May 18, 1999).

**6.** Supreme Court decisions have recognized, however, that there may be indirect taxes that are not excise taxes. For example, Justice

Chase stated in *Hylton v. United States,* 3 U.S. (3 Dall.) 171, 1 L.Ed. 556 (1796):

If there are any other species of taxes that are not direct, and not included within the words duties, imposts, or excises, they may be laid by the rule of uniformity or not, as congress shall think proper and reasonable.

The first direct tax case to come before the Supreme Court was *Hylton,* which upheld an unapportioned tax on carriages. 3 U.S. (3 Dall.) at 171. The statute at issue in *Hylton,* Act of June 5, 1794, ch. 45, 1 Stat. 373 (repealed 1796), imposed a tax "upon all carriages for the conveyance of persons, which shall be kept by or for any person, for his or her own use, or to be let out to hire, or for the conveying of passengers." *Id.* at 373–74. The Court rejected the plaintiff's challenge to the carriage tax as an unapportioned direct tax, holding that the carriage tax was indirect. *Hylton,* however, was not entirely clear as to the standard to be used in distinguishing direct taxes from indirect taxes. Three Justices participated in the decision, each writing a separate opinion. Justice Chase declined to "give a judicial opinion" as to what was encompassed in the category of direct taxes, but he expressed his inclination "that the direct taxes contemplated by the constitution, are only two, to wit, a capitation or poll tax ... and a tax on land." 3 U.S. (3 Dall.) at 175. Justice Chase further explained that a tax on "a consumable commodity ... is on the expense of the owner," and therefore should be considered an indirect tax. *Id.* Justice Paterson also declined to decide "[w]hether direct taxes, in the sense of the constitution, comprehend any other tax than a capitation tax, and a tax on land," *id.* at 177, but he affirmatively stated that "[a]ll taxes on expenses or consumption are indirect taxes," *id.* at 180. Justice Iredell noted that "[p]erhaps a direct tax, in the sense of the constitution, can mean nothing but a tax on something inseparably annexed to the soil, something capable of apportionment under all such circumstances. A land or a poll tax may be considered of this description.... In re-

gard to other articles, there may possibly be considerable doubt." *Id.* at 183. Declining to decide the precise parameters of a direct tax, Justice Iredell concluded that "[i]t is sufficient, on the present occasion, for the court to be satisfied that this is not a direct tax," *id.* at 183, because it would have been "manifestly absurd" to apportion the carriage tax, *id.* at 182. Each of the three Justices that wrote an individual opinion, Justice Chase, Justice Paterson, and Justice Iredell, concluded that a rule of apportionment with respect to the carriage tax would be impractical and "create great inequality and injustice" because the number of carriages in a state did not necessarily correlate to the state's population. *Id.* at 174; *see also id.* at 179; *id.* at 183. Though Justice Wilson, writing separately, stated that he found it unnecessary to participate in the decision, he agreed that the tax was constitutional without providing his reasons. *Id.* at 183–84.

The Court has never overruled *Hylton.* In fact, in the years since *Hylton,* the Supreme Court has repeatedly cited *Hylton* with approval in rejecting direct tax challenges. *See, e.g., Fernandez v. Wiener,* 326 U.S. 340, 353, 66 S.Ct. 178, 90 L.Ed. 116 (1945); *Bromley v. McCaughn,* 280 U.S. 124, 136, 50 S.Ct. 46, 74 L.Ed. 226 (1929); *Thomas v. United States,* 192 U.S. 363, 370, 24 S.Ct. 305, 48 L.Ed. 481 (1904); *Springer v. United States,* 102 U.S. 586, 599–601, 26 L.Ed. 253 (1880).

### III

The appellant places its primary reliance on the Supreme Court decisions in *Pollock v. Farmers' Loan & Trust Co.,* 157 U.S. 429, 15 S.Ct. 673, 39 L.Ed. 759 (1895) ("*Pollock I*"), and *Pollock v. Farmers' Loan & Trust Co.,* 158 U.S. 601, 15 S.Ct.

If the framers of the constitution did not contemplate other taxes than direct taxes, and duties, imposts and excises, there is a great inaccuracy in their language. If these four species of taxes were all that were meditated, the general power to lay taxes was unnecessary.
*Id.* at 173, 3 U.S. 171.

912, 39 L.Ed. 1108 (1895) ("*Pollock II*"), which invalidated an income tax on the ground that it was an unapportioned direct tax under the federal Constitution.[7]

*Pollock* came twice before the Court. Initially, in *Pollock I* the Court invalidated an income tax insofar as it was a tax upon the income from real property. 157 U.S. at 583, 15 S.Ct. 673. The Court held that it was a direct tax because a tax on the real property itself would have been a direct tax. *See id.* at 580–81, 15 S.Ct. 673. But the Court was equally divided as to whether a tax on the income from personal property also constituted a direct tax. *See id.* at 586, 15 S.Ct. 673. On rehearing in *Pollock II* the Court held that the same income tax was an invalid direct tax insofar as it taxed the income of personal property. 158 U.S. at 637, 15 S.Ct. 912.

The appellant admits that the Sixteenth Amendment overruled the *Pollock* deci-sions (collectively "*Pollock*") in part by explicitly authorizing a federal income tax "on incomes, from whatever source derived, without apportionment among the several States, and without regard to any census or enumeration," U.S. Const. amend. XVI; *see also Utah v. Evans*, 536 U.S. 452, 492 n. 2, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002) (Thomas, J., concurring), but the appellant argues that *Pollock* stands more broadly for the proposition that any tax on the ownership of either personal or real property itself is direct and must be apportioned. The appellant further argues that because the Supreme Court has never specifically overruled the direct tax holding of *Pollock*, we must invalidate the EPACT special assessments based on the reasoning in *Pollock*. We agree that *Pollock* has never been overruled, though its reasoning appears to have been discredited.[8] Nonetheless, we

---

**7.** The appellant also cites *Dawson v. Kentucky Distilleries & Warehouse Co.*, 255 U.S. 288, 41 S.Ct. 272, 65 L.Ed. 638 (1921), as an instance where the Court struck down a tax as an unconstitutional direct tax. This decision, however, has no bearing on the present case because *Dawson* related to a state tax challenged on state constitutional grounds. *See id.* at 292, 41 S.Ct. 272. The state tax at issue in *Dawson* imposed an "annual license tax of fifty cents a gallon upon all whiskey either withdrawn from bond or transferred in bond from Kentucky to a point outside that State." *Id.* at 289, 41 S.Ct. 272 (quoting Act of Mar. 12, 1920, ch. 13). The Kentucky Constitution distinguished between property taxes and occupation taxes, requiring the former to be "uniform upon all property of the same class subject to taxation." *Id.* at 291, 41 S.Ct. 272(quoting Ky. Const. § 171); *see also* Ky. Const. § 171 ("Taxes shall be levied and collected for public purposes only and shall be uniform upon all property of the same class subject to taxation within the territorial limits of the authority levying the tax") and 181 ("The General Assembly may, by general laws only, provide for the payment of license fees on franchises, stock used for breeding purposes, the various trades, occupations and professions, or a special or excise tax....").

The Court considered "whether as to such this fifty cents a gallon tax is an occupation tax or is a property tax" under the Kentucky Constitution, holding the tax to be on the property of whiskey and therefore invalid because not uniform. *Dawson*, 255 U.S. at 292–94, 41 S.Ct. 272. In determining, however, that the tax was one on property, the Court did not consider whether the tax was direct or indirect because this distinction was not the basis of the challenge to the tax under the Kentucky Constitution.

**8.** While some earlier cases appeared to approve of the reasoning in *Pollock, see Thomas*, 192 U.S. at 370, 24 S.Ct. 305; *Brushaber v. Union Pac. R.R. Co.*, 240 U.S. 1, 16–19, 36 S.Ct. 236, 60 L.Ed. 493 (1916), the Supreme Court seemed to disapprove of the reasoning that an income tax on proceeds from the use of land was equivalent to a tax on the land itself in its 1937 *N.Y. ex rel. Cohn v. Graves*, 300 U.S. 308, 315, 57 S.Ct. 466, 81 L.Ed. 666 (1937), decision. This reasoning would seem to apply to a tax on the proceeds from personal property. *See also* Ackerman, 99 Colum. L.Rev. at 51 (suggesting that the Supreme Court's Sixteenth Amendment jurisprudence indicates that *Pollock's* "teachings on the scope of the 'direct tax' clauses should be

are obligated to follow *Pollock* until it is explicitly overruled by the Supreme Court. *Agostini v. Felton*, 521 U.S. 203, 237, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). However, we do not think that *Pollock* stands for the proposition that the appellant urges or that the EPACT special assessments fall within *Pollock's* definition of direct taxes. In view of the centrality of *Pollock* to the appellant's argument, we must consider *Pollock* at length.

In *Pollock I* the Supreme Court confronted a federal income tax for the years 1895–1900 "upon the gains, profits, and income received in the preceding calendar year by every citizen of the United States ... whether ... derived from any kind of property, rents, interests, dividends, or salaries, or from any profession, trade, employment, or vocation." 157 U.S. at 434 n. 1, 15 S.Ct. 673 (quoting Act of Aug. 27, 1894, ch. 349, § 27, 28 Stat. 509, 553). The plaintiff in *Pollock* contended that the statute constituted an unapportioned direct tax because the imposition of a tax on the income of property, whether real estate or personal property, effectively imposed a tax upon the property itself. *Id.* at 555, 15 S.Ct. 673. The Supreme Court held that the tax on income from real estate was a direct tax and was therefore invalid unless apportioned. *Id.* at 583, 15 S.Ct. 673. Having reviewed its precedent on the question of direct versus indirect taxes "from that of *Hylton* to that of *Springer*," the Court found that its prior decisions "held real estate liable to direct taxation only." *Id.* at 579, 15 S.Ct. 673. The Court concluded that "[a]n annual tax upon the annual value or annual user of real estate appears to us the same in substance as an annual tax on the real estate, which would

be paid out of the rent or income." *Id.* at 581, 15 S.Ct. 673. The Justices, however, remained "equally divided" as to whether a tax on income from personal property was a direct tax requiring apportionment. *Id.* at 586, 15 S.Ct. 673.

On rehearing, in *Pollock II*, the Court held that the tax on income from personal property was also an invalid direct tax. *Pollock II*, 158 U.S. at 637, 15 S.Ct. 912. The outcome of *Pollock II* was based in large part on the reasoning that a tax on income from personal property was invalid because a tax on the personal property would itself be invalid. The Court explained that the Constitution "forbids all unapportioned direct taxes; and we know of no warrant for excepting personal property from the exercise of the power." *Id.* at 628, 15 S.Ct. 912. Consequently, the Court held, "the lack of power to levy any but an apportioned tax on real and personal property equally exists as to the revenue therefrom." *Id.* at 630, 15 S.Ct. 912. A general tax on personal property was therefore a direct tax, and as, such unconstitutional because unapportioned.

The Court, however, was clear that not all unapportioned taxes on personal property constituted invalid direct taxes. Throughout the *Pollock II* opinion the Court was careful to describe the income tax at issue as a general tax on the whole of an individual's personal property. *Id.* at 622, 15 S.Ct. 912 (holding that a "tax on the whole income of a property" is a direct tax); *id.* at 625, 15 S.Ct. 912 (describing the tax at issue as a tax on "the whole income" from an individual's "whole property"); *id.* at 627, 15 S.Ct. 912 (explaining that a "general unapportioned tax" on the

---

dispatched into the dustbin of constitutional history"); *but see* Erik M. Jensen, *The Apportionment of "Direct Taxes": Are Consumption Taxes Constitutional*, 97 Colum. L.Rev. 2334, 2345 (1997) ("A repudiation of *Pollock* is at

most a rejection of the Courts conclusion that a tax on income from property is a direct tax; it speaks not at all to other levies that might be direct taxes. Subsequent case law did not eliminate the concept of 'direct taxes' ...")

income of property is a direct tax just as would be a tax on the property itself); *id.* at 633, 15 S.Ct. 912 (framing the issue in the case as "whether a general unapportioned tax on the income of real and personal property can be sustained"); *id.* at 637, 15 S.Ct. 912 (describing the tax at issue as "a direct tax on all real estate and personal property, or the income thereof"). The Court made clear that its holding only extended to such general taxes. First, it did not overrule its earlier opinion in *Hylton,* which upheld an unapportioned tax on carriages. *Id.* at 626–27, 15 S.Ct. 912. Although the Court criticized *Hylton* as "badly reported," it quoted the opinion as good law, finding that the seriatim opinions in *Hylton* decided only "that a tax on carriages was an excise, and, therefore, an indirect tax" and that this holding did not foreclose the possibility that an income tax levied on all personal property was a direct tax that demanded apportionment. *Id.* The Court found "nothing in the *Hylton* case in conflict" with its understanding of a direct tax as a tax levied "upon one's whole income." *Id.* at 625–26, 15 S.Ct. 912.

Elsewhere in the opinion, the Court again made clear that its reasoning reached only *general* taxes on personal property. The Court approvingly quoted Alexander Hamilton's definition of direct taxes, which he championed in his successful litigation of *Hylton:*

> The following are presumed to be the only direct taxes. Capitation or poll taxes. Taxes on lands and buildings. *General assessments,* whether on the *whole property* of individuals, or on their *whole real or personal estate;* all else must of necessity be considered as indirect taxes.

*Id.* at 625, 15 S.Ct. 912 (emphases added) (quoting Hamilton's "argument in the *Hylton case* . . . . [which] was not reported . . . but was published in 1851 by his son in the edition of Hamilton's writings except the Federalist"). The Court went on to endorse that definition, using Hamilton's standard to analyze the income tax at issue. The Court stated: "[Hamilton] gives . . . a definition which covers the question before us. A tax upon one's *whole income* is a tax upon the annual receipts from his *whole property,* and as such falls within the same class as a tax upon that property, and is a direct tax, in the meaning of the Constitution." *Id.* (emphases added); *see also Knowlton v. Moore,* 178 U.S. 41, 82, 20 S.Ct. 747, 44 L.Ed. 969 (1900) (summarizing the holding of *Pollock* as prohibiting "taxes on persons solely because of their general ownership of property [real or personal] from being levied by any other rule than that of apportionment").

In addition to *Hylton, Pollock* discussed other cases that rejected direct tax challenges to taxes on particular items of personal property, such as *Scholey v. Rew,* 90 U.S. (23 Wall.) 331, 23 L.Ed. 99 (1874) (involving a succession tax on realty), without overruling these cases. *See Pollock I,* 157 U.S. at 577–79, 15 S.Ct. 673.[9] Since its decision in *Pollock* the Court has repeatedly sustained unapportioned taxes on particular items of personal property that fell short of general taxes on the whole of one's property. *See, e.g., Fernandez,* 326 U.S. at 362, 66 S.Ct. 178 (upholding an estate tax collected upon community property); *Bromley,* 280 U.S. at 138, 50 S.Ct. 46 (upholding a gift tax); *N.Y. Trust Co. v. Eisner,* 256 U.S. 345, 41 S.Ct. 506, 65 L.Ed. 963 (1921) (upholding an estate tax); *Stanton v. Baltic Mining Co.,* 240 U.S.

---

**9.** Indeed, *Pollock* did not even explicitly overrule the Supreme Court's earlier decision in *Springer,* 102 U.S. 586, 26 L.Ed. 253, which sustained the Civil War Income Tax, on the theory that "a tax on professional receipts might be treated as an excise or duty, and therefore indirect." *Pollock I,* 157 U.S. at 579, 15 S.Ct. 673.

103, 36 S.Ct. 278, 60 L.Ed. 546 (1916) (upholding a tax on the annual production of mines); *Billings v. United States*, 232 U.S. 261, 34 S.Ct. 421, 58 L.Ed. 596 (1914) (upholding a tax on foreign built yachts); *Thomas*, 192 U.S. at 370, 24 S.Ct. 305 (upholding a stamp tax on memorandum or contracts of sale of a certificate of stock); *Spreckels Sugar Ref. Co. v. McClain*, 192 U.S. 397, 24 S.Ct. 376, 48 L.Ed. 496 (1904) (upholding a tax on the refining of sugar); *Patton v. Brady*, 184 U.S. 608, 22 S.Ct. 493, 46 L.Ed. 713 (1902) (upholding a tax on the manufacturing of tobacco); *Knowlton*, 178 U.S. at 83, 20 S.Ct. 747 (upholding a tax on legacies and distributive shares of personal property).[10]

■ *Pollock*, therefore, does not teach that the EPACT special assessments are direct taxes requiring apportionment. We agree with *Pollock's* conclusion that the only impermissible direct tax on personal property is a general tax on broad classes of personal property.[11] Unlike the income tax at issue in *Pollock*, the tax at issue here is not a general tax on the whole of one's personal property or even a tax on a broad class of personal property. Rather,

it is a carefully tailored tax, like the one sustained in *Hylton* and other cases, levied upon only one particular kind of personal property, government-enriched uranium. It is therefore not a direct tax.

## IV

### A

■ There is an alternative reason why the EPACT special assessments are not direct taxes. Excises are not direct taxes, and the tax at issue here is clearly an excise. The Constitution conceives of excise taxes in contradistinction to direct taxes, requiring "direct Taxes" to be "apportioned among the several States," U.S. Const., art. I, § 2, cl. 3, while requiring "Excises [to] be uniform throughout the United States," *id.* art. I § 8, cl. 1. Both *The Federalist* and the Supreme Court have recognized that excise taxes are not direct taxes. In *The Federalist*, Hamilton stated that "internal taxes may be subdivided into those of the direct and those of the indirect kind ... [and] the latter ... must be understood [as] duties and excises on articles of consumption." *The Federal-*

---

10. *See also* Jensen, 97 Colum. L.Rev. at 2375 (*Pollock* was precedent shattering but, despite its logic, it had little influence outside the income-tax area. After (and despite) *Pollock*, the Supreme Court continued to view the direct-tax rules narrowly. Several cases made it clear that Pollock was to be given no expansive interpretation; the *Pollock* analysis was not to be extended to overturn other once-settled rules." (footnote omitted)).

11. In *Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920), the Supreme Court invalidated a tax upon corporate stockholders' "share of the undivided profits previously accumulated by the corporation" imposed on stock dividends. *Id.* at 217, 40 S.Ct. 189. The Court held that this tax on stock dividends was unconstitutional because it was an unapportioned direct tax. *Id.* at 219, 40 S.Ct. 189. The Sixteenth Amendment did not exempt the tax from the constitutional appor-

tionment requirement because the tax could not be considered a tax on income. *See id.* at 192, 40 S.Ct. 189. The appellant here places little reliance on *Eisner v. Macomber*, and properly so. The continued viability of that decision is open to question. *See Helvering v. Griffiths*, 318 U.S. 371, 404, 409, 63 S.Ct. 636, 87 L.Ed. 843 (1943) (Douglas, J. dissenting) (describing *Eisner v. Macomber* as "d[ying] a slow death" and expressing the opinion that *Eisner v. Macomber* should have been overruled); *Helvering v. Gowran*, 302 U.S. 238, 58 S.Ct. 154, 82 L.Ed. 224 (1937); *Koshland v. Helvering*, 298 U.S. 441, 446, 56 S.Ct. 767, 80 L.Ed. 1268 (1936). Furthermore, in light of other Supreme Court decisions, cited in the text, upholding taxes on particular property, *Eisner v. Macomber* must be viewed as invalidating only unapportioned taxes on the particular broad class of property (corporate stock) involved in that case.

*ist* No. 36, at 219 (Alexander Hamilton) (Clinton Rossiter ed., 1961); *see also id.* No. 21 at 142–43. Likewise, the Supreme Court has referred to excise taxes "as the antithesis" of direct taxes. *Knowlton,* 178 U.S. at 81, 20 S.Ct. 747 (framing the issue in the case as the Court being "asked to decide that a tax is a direct tax on property which has at all times been considered as the antithesis of such tax; that is, has ever been treated as a duty or excise"); *see also Bromley,* 280 U.S. at 136, 138, 50 S.Ct. 46 (holding that the Court need not determine the precise boundaries of direct taxes because the tax at issue was clearly an excise and therefore not a direct tax, and explaining that excises "have been deemed to be indirect and so valid although not apportioned"); *Scholey,* 90 U.S. (23 Wall.) at 348, 23 L.Ed. 99 ("Neither duties nor excises were regarded as direct taxes by the authors of the *Federalist*."). The tax here, for two separate reasons, is an excise and therefore not a direct tax.

First, the EPACT tax is an excise because it taxes consumables. As *The Federalist* notes, indirect taxes include "excises on articles of consumption." *The Federalist* No. 36, at 219; *see also id.* No. 21, at 142 (including "[i]mposts, excises, and in general, all duties upon articles of consumption" in the category of taxes not requiring apportionment). In determining that the carriage tax was an excise, *see Pollock II,* 158 U.S. at 627, 15 S.Ct. 912, two of the three seriatim opinions in *Hylton* also emphasized the "consumable commodity" nature of carriages as a determining factor. *Hylton,* 3 U.S. (3 Dall.) at 175 (Chase, J.); *id.* at 180–81, 3 U.S. 171 (Patterson, J.). The appellant contends, however, that the consumability of a taxed good is not an indicium of indirect taxes. Rather, a tax must be on the actual consumption of the goods to fall within the category of indirect taxes. This understanding does not find support in *Hylton,* where the tax was on owner-

ship and not on actual use. None of the Court's seriatim opinions considered whether a carriage as a "consumable commodity" was actually consumed or used.

The Court embraced this consumability reasoning again in *Patton,* a case that arose well after *Pollock.* The contested statute in *Patton* imposed a tax on "tobacco and snuff, however prepared, manufactured and sold, for consumption or sale." *Patton,* 184 U.S. at 617, 22 S.Ct. 493 (quoting Act of June 13, 1898, ch. 448, § 3, 30 stat. 448, 449). The Court upheld the statute as an excise tax not requiring apportionment. *See id.* at 623, 22 S.Ct. 493. In doing so, the Court considered the meaning of the term "excise." *Id.* at 617–18, 22 S.Ct. 493. The Court held that the tobacco tax was "[o]bviously ... intended by Congress as an excise," *id.* at 615, 22 S.Ct. 493, because it was imposed "on an article manufactured for consumption, and imposed at a period intermediate the commencement of manufacture and the final consumption of the article," *id.* at 618, 22 S.Ct. 493. The Court further qualified the scope of the excise tax by explaining that "it is not a tax upon property as such but upon certain kinds of property, having reference to their origin and their *intended use.*" *Id.* at 619, 22 S.Ct. 493 (emphasis added). Thus the Court again found the tax to be indirect, an excise in particular, because it was imposed on goods of a consumable nature. And again, the Court upheld the tax without regard to the actual consumption of such goods. Enriched uranium is also a "consumable commodity," irrespective whether it is actually used, and a tax on enriched uranium is therefore an excise.

Second, the EPACT tax is an excise because its incidence falls on a particular activity related to property—here the purchase of enrichment services or enriched

uranium—as opposed to the mere ownership of property. The Court has "consistently held, almost from the foundation of the government, that a tax imposed upon a particular use of property or the exercise of a single power over property incidental to ownership, is an excise which need not be apportioned." *Bromley,* 280 U.S. at 136, 50 S.Ct. 46. In particular, the Court has stated that a tax upon the "retail sale" of a "commodity" is an excise. *Patton,* 184 U.S. at 618, 22 S.Ct. 493. So too, in *Thomas,* the Court held "a stamp tax on a memorandum or contract of sale of a certificate of stock" to be an excise, explaining that "[t]he sale of stocks is a particular business transaction" and that "[t]he stamp duty is contingent on the happening of the event of sale." 192 U.S. at 370–71, 24 S.Ct. 305. As such, excise taxes are distinguishable from those taxes that "fall[ ] upon the owner merely because he is [an] owner." *Bromley,* 280 U.S. at 137, 50 S.Ct. 46; *see also Stanton,* 240 U.S. at 114, 36 S.Ct. 278 (emphasizing that an excise tax falls upon privileges of property as opposed to a tax "because of ownership"); *Fernandez,* 326 U.S. at 354, 66 S.Ct. 178 ("[W]ithout apportionment [Congress] may lay an excise upon a particular use or enjoyment of property or the shifting from one to another of any power or privilege incidental to the ownership or enjoyment of property."); *see also Billings,* 232 U.S. at 280, 34 S.Ct. 421. We see no difference in substance between the sale of property and the purchase of property. Indeed, the Supreme Court has repeatedly sustained excise taxes on the receipt of property via inheritance. *See Fernandez,* 326 U.S. at 353, 66 S.Ct. 178 ("If the gift of property may be taxed, we cannot say that there is any want of constitutional power to tax the receipt of it, whether as the result of inheritance or otherwise ...." (citation omitted)).

The EPACT special assessments fall within this definition of excise taxes as well. The EPACT tax was not imposed on the mere ownership of enriched uranium. Rather, the tax was limited to purchases of government enrichment services or government-enriched uranium "for the purpose of [domestic] commercial electricity generation" prior to October 24, 1992. 42 U.S.C. § 2297g–1(c). These qualifications make clear that the special assessments were *not,* as the appellant urges, imposed on the mere "ownership of the uranium itself." (Br. for Appellant at 11.)

**B**

 We conclude that an excise tax (in contradistinction to a direct tax) is a tax imposed on the acquisition, ownership, or use of particular kinds of categories of property that falls short of being a general tax on the whole of an individual's personal property. Also, the tax here on the ownership of government-enriched uranium purchased directly or indirectly from the government is indistinguishable from taxes on carriages, tobacco, yachts and other types of personal property that have long been accepted as excise taxes. The EPACT tax is not therefore a direct tax, and does not require apportionment.

**C**

The appellant alternatively argues that the EPACT tax is not an excise because it is unavoidable, the tax here having been imposed retroactively after the purchase of government enrichment services or government-enriched uranium. The appellant points out that *The Federalist* in general described direct taxes as being unavoidable taxes and excise taxes as being avoidable taxes. In *The Federalist* No. 21, Hamilton discussed the economic theory behind unapportioned "[i]mposts, excises, and, in general, all duties upon articles of

consumption," *id.* at 142, explaining that "[i]f duties are too high, they lessen the consumption; the collection is eluded; and the product to the treasury is not so great as when they are confined within proper and moderate bounds ... itself a natural limitation on the power of imposing them." *Id.* at 142–43. Such taxes, Hamilton explained, "usually fall under the denomination of indirect taxes." *Id.* at 143.

But *The Federalist* hardly describes avoidability as a necessary characteristic of indirect taxes. In *Pollock I* the Court did state that "[o]rdinarily all taxes paid primarily by persons who can shift the burden upon some one else ... are considered indirect taxes" and that general property taxes that "cannot be avoided, are direct taxes." *Pollock I*, 157 U.S. at 558, 15 S.Ct. 673; *see also Thomas*, 192 U.S. at 371, 24 S.Ct. 305. This passage, however, does not limit the category of excises to avoidable taxes, rather it indicates that avoidability is generally a feature of excise taxes. In *Knowlton*, a case that upheld a tax on "legacies and distributive shares," 178 U.S. at 44, 20 S.Ct. 747, the Court explicitly rejected the appellant's argument here that "it was decided in the income tax cases [including *Pollock* ] that ... [if] duties cannot be shifted from the one on whom they are first cast by law ... they are direct taxes requiring apportionment." *Id.* at 81–82, 20 S.Ct. 747. The Court held that the succession tax at issue did not have to be avoidable to be indirect. The Court considered the opposite contention a "fallacy," because although "the income tax cases [present] the theory of certain economists by which direct and indirect taxes are classified with reference to the ability to shift the same ... this disputable theory was not the basis of the

conclusion of the [C]ourt" in those cases. *Id.* at 81–82, 20 S.Ct. 747. The Court rejected the argument that "excises which are not the essential equivalent of a tax on property generally, real or personal, solely because of its ownership, must be converted into direct taxes, because ... they could not be shifted from the person upon whom they first fall." *Id.* In a subsequent estate tax case, the Court relied on its opinion in *Knowlton* to reject the argument that "where the tax is on the privilege of receiving, the tax is indirect because it may be avoided, whereas here the tax is inevitable and therefore direct." *N.Y. Trust Co.*, 256 U.S. at 349, 41 S.Ct. 506. Following *Knowlton* and *New York Trust Co.*, we reject the appellant's argument that the EPACT tax is necessarily not an excise because it is unavoidable.[12]

## CONCLUSION

For the foregoing reasons, we affirm the decision of the Court of Federal Claims.

## *AFFIRMED*

## COSTS

No costs.

---

**12.** Union Electric requests in a footnote that "if this Court chooses to remand ... [it] make clear that the Court of Federal Claims erred in dismissing Union Electric's contract claim." (Br. for the Appellant at 52 n. 11.) The appellant's contract claim is foreclosed by our earlier decisions in *Yankee Atomic* and *Commonwealth Edison*.