# United States Court of Appeals for the Federal Circuit

04-5079

PSI ENERGY, INC. and CINCINNATI GAS & ELECTRIC CO.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Eric J. Marcotte, Winston & Strawn, LLP, of Washington, DC, argued for plaintiff-appellant.  With him on the brief was Nathan C. Guerrero.

James G. Bruen, Jr., Special Litigation Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  With him on the brief were Peter D. Keisler, Assistant Attorney General, and J. Christopher Kohn, Director.

Appealed from:  Untied States Court of Federal Claims

Judge Lawrence J. Block

# United States Court of Appeals for the Federal Circuit

04-5079


PSI ENERGY, INC. and CINCINNATI GAS & ELECTRIC CO.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  June 10, 2005

_____


Before MAYER,* NEWMAN and CLEVENGER, <u>Circuit Judges</u>.

Opinion for the court filed by <u>Circuit Judge</u> NEWMAN.  Dissenting opinion filed by <u>Circuit Judge</u> CLEVENGER.

NEWMAN, <u>Circuit Judge</u>.


PSI Energy, Inc. and Cincinnati Gas & Electric Co. (together "the appellants") appeal

the judgment of the United States Court of Federal Claims, holding them liable for tax levied

on users of enriched uranium for generation of nuclear power, although the

_____

\*        Haldane Robert Mayer vacated the position of Chief Judge on December 24, 2004.

appellants did not use the enriched uranium or produce nuclear power.[1] We conclude that the tax was improperly levied on the appellants, and reverse the decision of the Court of Federal Claims.

BACKGROUND

A nuclear reactor operates using the uranium isotope U-235. As the reactor fuel is depleted, the U-235 reverts to the inactive form. To use the uranium, it is necessary to increase the concentration of U-235 to that needed for nuclear reaction, a process called "enrichment." Since 1977 the United States government has performed this enrichment and has charged the user-utility for the cost thereof. The fee is calculated by a formula that includes the difference in the amount of U-235 in the starting material, and the amount of U-235 in the enriched fuel that is returned to the utility. This difference is defined in terms of "separative work units" (SWU). The appellants explain that SWUs are not tangible objects, but are the method used to quantify the amount of effort expended to produce the enriched uranium. Thus although the utility does not receive back the same batch of uranium that it delivered to the government, it is charged a fee based on the amount of enrichment acquired by the utility.

Over the years, this activity contaminated the government's uranium processing facilities with various radioactive and other waste products. In 1992 Congress enacted the Energy Policy Act (EPACT), 42 U.S.C. §2297g-1(a) et seq., whose purpose was to recover the part of the cost of decontamination that was due to this work done for power-generating

---

1    PSI Energy, Inc. v. United States, 59 Fed. Cl. 590 (2004).

04-5079                                         2

utilities (the cost due to military uses was not charged to the utilities).  The EPACT levied a "special assessment" on the utilities whose spent nuclear fuel was processed by the government.  The assessment was measured by the number of SWUs purchased from the DOE and used by the utility.  The EPACT provides that if the utility sells the SWU, it will not be considered to have purchased the SWU from the government:

> (2)  a utility shall not be considered to have purchased a separative work unit from the Department if such separative work unit was purchased by the utility, but sold to another source.

42 U.S.C. §2297g-1(c).  For discussion of the background of the statute, see Commonwealth Edison Co. v. United States, 271 F.3d 1327 (Fed. Cir. 2001) (*en banc*).

The appellant utilities purchased enriched uranium from the government from 1977 to 1983, but ultimately did not use any of it to generate electric power.  In 1984 the appellants sold their entire stock of nuclear fuel to other utilities in the secondary market.  Due to market standardization, the selling price was stated as if the resold fuel contained fewer SWUs than the utilities had purchased from the government.

The government levied a tax of $336,987.74 on PSI and over $67,000 on Cincinnati Gas, on the theory that because these utilities sold nominally fewer SWUs than they received from the government, they were liable for the assessment on the purportedly missing SWUs, whether or not they were used by these utilities.  The Court of Federal Claims held that the tax was correctly applied.

DISCUSSION

The appellants argue that the statute levies the tax on the user of the fuel, and that since they did not use the fuel, they are not subject to the tax. They argue that it is incorrect to tax the appellants as if they used the fuel, when they sold their entire stock. The appellants state that although the tax provisions of the EPACT designate the SWU as a convenient measure of the amount of enrichment, the statute explicitly exempts liability for the tax when the enriched fuel is resold. The appellants state that since the entire quantity of fuel was sold, the statute eliminates their liability for the tax, and that it is irrelevant that they had restated the SWUs present in the fuel that was sold.

The government responds that the tax is based on SWUs, and that by selling the fuel as if the fuel had fewer SWUs, it was as if the appellants used the fuel embodying the difference in SWU. Although the statute does not contemplate this apparently rare fact situation, it is clear that the tax was intended to be levied on the user of the enriched uranium. On any theory, the appellants did not use any of the enriched uranium; they simply resold it. In Union Electric Co. v. United States, 363 F.3d 1292, 1294 (Fed. Cir. 2004), this court explained:

> [A]s to those utilities that submitted the uranium to the government for processing, the tax was effectively imposed on their utilization of the government enrichment services. With respect to companies that purchased already-enriched uranium from those that had utilized the government enrichment services, the tax was effectively imposed on their purchase of the enriched uranium.

The court held that the tax was properly imposed on the ultimate user, and that the tax "did not apply to . . . (3) domestic utilities that sold their government-enriched uranium prior to October 24, 1992." Id. A SWU does not exist independently of the uranium nuclear fuel,

04-5079                                          4

for it measures the degree of enrichment acquired by the utility. When the appellants sold all of their enriched uranium, and retained none, they could not be charged with the tax levied on users.

The government argues that its interpretation of §2279g-1(c)(2) should be accorded deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc, 467 U.S. 837, 843-44 (1984), stating that the statute is ambiguous and that the government's interpretation of an ambiguous statute must be given deference. However, we discern no ambiguity. The government argues that the Department of Energy stated the position now taken, in a comment during a rulemaking hearing in 1994. That comment, however, concerned the actual assay of resold uranium, not a discounted price. Nor is deference warranted for informal comments when the statute deals with the issue. There is no ambiguity in the statutory requirement and the precedent of Yankee Atomic Electric Co. v. United States, 112 F.3d 1569 (Fed. Cir. 1997) and Union Electric, supra, that the cleanup tax is levied on the user of the fuel, not on a non-user who simply resells the fuel.[2]

When all of the enriched fuel was resold by the appellants, by statute they are not liable for the tax. It is irrelevant that the fuel was resold for less than its cost in SWUs. The

---

[2]     We take note that a member of this panel would hold these utilities liable on the broad ground that "liability stems from the contamination of the processing facility and the costs associated with decommissioning gaseous diffusion plants." The statute, however, is explicit in imposing the assessment only on the user of the enriched uranium, as this court's precedent has confirmed. Yankee Atomic, 112 F.3d at 1575 ("the Act targets whichever utility eventually used and benefitted from the DOE's enrichment services"). The dissent further strays in stating that the effect of this decision is that the tax on the missing SWUs is "lost," for that question is not here at issue, and was not decided by either the trial court or this court.

judgment of liability is reversed; on remand the appellants shall recover the assessment, with interest in accordance with law.

## REVERSED AND REMANDED

# United States Court of Appeals for the Federal Circuit

04-5079

PSI ENERGY, INC., and CINCINNATI GAS & ELECTRIC CO.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

CLEVENGER, Circuit Judge, dissenting.

The court today resolves that the Court of Federal Claims has misread the relevant statutes in imposing liability on the appellants. For the reasons that follow, it is the court today that errs, not the Court of Federal Claims. In a nutshell, Congress designed a program for industry participation in enrichment plant clean-up costs that keys to the number of separative work units ("SWUs") purchased from the government, not the number of pounds of uranium used by a utility.

This interpretation is in keeping with prior precedent involving the EPACT statute by this court. See Union Elec. Co. v. United States. 363 F.3d 1292 (Fed. Cir. 2004) (holding that the special assessment under EPACT was a constitutional excise tax); Fla. Power & Light Co. v. United States, 307 F.3d 1364 (Fed. Cir. 2002) (holding that the Contract Disputes Act did not apply to enrichment contracts with the government because they are contracts for services); Commonwealth Edison Co. v. United States,

271 F.3d 1327 (Fed. Cir. 2001) (en banc) (holding that the special assessment under EPACT was not a taking or a breach of the utilities' contracts by the government and was not a violation of due process); Maine Yankee Atomic Power Co. v. United States, 271 F.3d 1357 (Fed. Cir. 2001) (holding that the special assessment was not unconstitutional under the Equal Protection Clause); Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569 (Fed. Cir. 1997) (holding that the special assessment did not breach the enrichment contracts between the utilities and the government by retroactively increasing the price of previously purchased uranium).

I

PSI Energy and Cincinnati Gas & Electric ("the appellants") claim that they are specially situated because, unlike other utilities that contracted with the government for enrichment services, or secondary purchasers, who used the enriched fuel in nuclear power plants, the appellants sold the entirety of their supply without depleting one ounce in fission reactors. At oral argument in this court, both parties asserted that this is the only case of its kind in the universe of utility claimants under the relevant statutes: that is, no other utility was left with unused SWUs due to the inability to transfer their SWUs to other utilities without economic loss. As such, this case appears to be unique. But even so, that is no reason to misapply the law. The appellants claim that because they sold all of the physical material to other utilities they cannot be assessed on any of the SWUs they originally purchased. To understand why this is not the case, the enrichment industry and the contracts that transferred uranium from the appellants to secondary purchasers should be briefly explained.

Enrichment increases the concentration of U-235, the isotope desirable in reactor fuel, and leaves behind depleted "tails" which have a concentration of U-235 below that of naturally-occurring uranium ore. The industry uses the term "tails assay" to denote the concentration of U-235 in the tailings—a higher tails assay means a less enriched product whereas a lower tails assay indicates material with a higher concentration of U-235. The energy required to process the material to a requested level of enrichment is measured in SWUs, which correlate generally to the costs of enrichment. Separative work is a measure of the energy or effort necessary to separate uranium of a given U-235 concentration into a mass of uranium with a higher concentration and a tailing with a lower concentration of the isotope.

Contracts between the Department of Energy ("DOE" or "government") and domestic utilities for enrichment services were fairly standardized. These contracts were structured as service agreements where the utilities provided the "feed" uranium material and were returned enriched product. These contracts were priced according to the number of SWUs necessary to produce the desired tails assay. In this case, the appellants contracted with the government for specific amounts of uranium processed to a tails assay of 0.2 percent.

After their business decision to not enter into the nuclear energy market, the appellants decided to sell the uranium in the secondary fuel market. The appellants' sales of enriched uranium in the secondary market were structured like the original purchase service contracts with the DOE enrichment processors. The contracts "designated a certain number of kilograms of enriched uranium to be sold at a specified tails assay" which was broken down for cost purposes into a SWU component and an

unenriched component as required by the purchaser.  At the time of sale, market conditions had changed because utilities operating reactors had found that a lower concentration of U-235 was optimal for electricity generation and had adopted a 0.3 percent tails assay as the market standard.  In the secondary market, 0.2 percent tails assay product was over-enriched and buyers were unwilling to pay for processing beyond that required to achieve a 0.3 percent tails assay.

The appellants had managed to offload most of their material under the 0.2 percent tails assay characterization before they had to make price concessions and recharacterize the material as enriched to a 0.3 percent tails assay in order to dispose of the material on the secondary market.  As part of these secondary market contracts, the number of SWUs resold with the uranium by the appellants reflected the amount of SWUs that would have been used to produce 0.3 percent tails assay material, not what the buyer actually received—the 0.2 percent tails assay material.  Therefore, although all of the material was sold by the appellants, the recharacterization effectively left SWUs unaccounted for and transferred only the SWUs necessary to produce 0.3 percent tails assay material to the new owner.  The size of the alleged economic harm to the appellants, the assessment on the SWUs that were not transferred, is $336,987.74 against PSI Energy and $67,000 against Cincinnati Gas.  Under the statute, the secondary purchaser is responsible for the assessment on the SWUs transferred.  Thus the question becomes who pays the assessment on the SWUs that were not transferred.

II

The plain language of the statute and the statutory scheme of EPACT dictate the outcome of this case. EPACT was intended to spread the costs of decommissioning enrichment facilities to all those who purchased or benefited from enrichment services performed by the DOE. To better understand the application of the special assessment, the language of the statute must be examined. It reads in relevant part:

(c)     Special assessment

The Secretary shall collect a special assessment from domestic utilities. The total amount collected for a fiscal year shall not exceed $150,000,000 (to be annually adjusted for inflation using the Consumer Price Index for all-urban consumers published by the Department of Labor). The amount collected from each utility pursuant to this subsection for a fiscal year shall be in the same ratio to the amount required under subsection (a) of this section to be deposited for such fiscal year as the total amount of separative work units such utility has purchased from the Department of Energy for the purpose of commercial electricity generation, before October 24, 1992, bears to the total amount of separative work units purchased from the Department of Energy for all purposes (including units purchased or produced for defense purposes) before October 24, 1992. For purposes of this subsection--

(1)     a utility shall be considered to have purchased a separative work unit from the Department if such separative work unit was produced by the Department, but purchased by the utility from another source; and

(2)     a utility shall not be considered to have purchased a separative work unit from the Department if such separative work unit was purchased by the utility, but sold to another source.

42 U.S.C. § 2297g-1 (emphases added).

Literally, the statute reads that the assessments are based on a utility's proportionate share of the enrichment services purchased in terms of SWUs, not on the quantity of uranium processed. The SWUs are also deemed the relevant units in secondary transactions that track liability. The secondary market for enriched uranium

was in view when the statute was drawn and Congress could have easily dealt with the assessment in terms of quantities of enriched uranium, but instead chose to tie the assessment to the source of the contamination—the separation itself. On its face, the special assessment is tallied by SWU expenditures. This construction makes sense in light of the purpose behind EPACT because liability stems from the contamination of the processing facility and the costs associated with decommissioning gaseous diffusion plants. A utility's share of these costs is proportional to the amount of services the government performed for that utility. The statute literally reads that contracting utilities should be responsible for the SWUs they contracted for except those transferred in the secondary market. Under this interpretation, the special assessment was properly assessed for the amount of "overprocessing" that was not effectively transferred by the secondary sale.

The structure and purpose of EPACT supports the literal meaning of the statute. EPACT sets up a scheme by which the government is compensated for a set amount of decommissioning costs. Even if some of these costs can be spread by the original contracting utility to a secondary purchaser, the government wants to receive the full assessment based on the contamination from the original contracted services. If all the SWUs do not transfer, the difference is not lost (which is the practical result of the majority's decision). Rather, the original contracting utility must pay for the difference. In other words, someone has to pay for the assessment on all the SWUs that went into enriching the material. Even if a secondary purchaser can take some of the responsibility, the statute does not contemplate simply erasing the remaining SWUs.

They are retained by the original contracting utility. Nothing in the statute requires all SWUs used in the creation of the fuel to be passed upon sale.

In essence the secondary purchaser only purchased the SWUs associated with the level of enrichment that they required—that is why the SWUs in this case are lower than the genuine amount required to produce this material—the purchaser did not want this particular material, it was willing to pay for material with a 0.3 percent tails assay and no more. The loss falls on the original utility that actually contracted for the service to produce 0.2 percent tails assay material. Imposing the special assessment on the originally contracting utility is not in conflict with the requirement that later purchasers who benefited from the enrichment, but did not contract for it, should be allocated decommissioning responsibility. These latecomers are taxed on only what they would have used of the enrichment service if they had to purchase service directly from the government.

Other case law of this court supports this interpretation. Yankee Atomic Electric Co. v. United States resolved whether the special assessment was a retroactive price increase of enrichment services contracts or was more similar to a tax on those who had used enrichment services. The court in Yankee Atomic stated "the Act targets whichever utility eventually used and benefited from the DOE's enrichment services." 112 F.3d at 1575 (emphases added). Yankee Atomic was specifically written to capture the aftermarket purchasers, not to exempt the original contracting utilities that used enrichment services. The court approved the applicability of the assessment to later users of the uranium by distinguishing the assessment from a retroactive increase in the contract price charged to the original contracting utility and found that purchasers in the

secondary market benefited from the enrichment services. See id. at 1577. Yankee Atomic should be viewed in combination with the language from the en banc decision in Commonwealth Edison which found the processing by the government itself conferred a benefit on the utilities. See Commonwealth Edison, 271 F.3d at 1346. Yankee Atomic speaks to the tax on the service, which later benefited the secondary purchasers, not a tax on the enriched material.

This court discussed the assessment as a "tax" again in Union Electric. The court found: "the tax at issue here is not a general tax on the whole of one's personal property or even a tax on a broad class of personal property. Rather, it is a carefully tailored tax . . . levied upon only one particular kind of personal property, government-enriched uranium." Union Elec., 363 F.3d at 1302. The court in Union Electric clarifies that the assessment is on the enrichment services by stating that "the EPACT tax is an excise because its incidence falls on a particular activity related to property—here the purchase of enrichment services or enriched uranium—as opposed to the mere ownership of property." Id. at 1303-04. Although not referencing SWUs, the court states that "[t]he EPACT tax was not imposed on the mere ownership of enriched uranium. Rather, the tax was limited to purchases of government enrichment services or government-enriched uranium for the purpose of [domestic] commercial electricity generation prior to October 24, 1992." Id. at 1304 (quotation omitted). Again the court focuses on the services, not the material. Union Electric was primarily directed at finding the special assessment to be an excise tax rather than a direct tax in order to resolve the constitutionality of the statute as applied to secondary purchasers and the original contracting utilities. The court only found that

as to those utilities that submitted the uranium to the government for processing, the tax was effectively imposed on their utilization of the government enrichment service. With respect to companies that purchased already-enriched uranium from those that had utilized the government enrichment services, the tax was effectively imposed on their purchase of the enriched uranium.

Id. at 1294. This case does not conflict with the proposition that the original contracting utilities are responsible for enrichment services that they could not transfer to secondary purchasers.

Union Electric did state that the "taxes" under EPACT "did not apply to . . . domestic utilities that sold their government-enriched uranium prior to October 24, 1992." Id. at 1294. Notably the support for this statement was drawn from the en banc decision of the Federal Circuit in Commonwealth Edison, but that case referred only to assessment relief based on SWUs sold in the secondary market; it did not base relief on the amount of uranium sold. See Commonwealth Edison, 271 F.3d at 1333. Yankee Atomic also explicitly followed the language in the statute, stating: "The Energy Policy Act requires contribution to the Fund from any domestic utility that purchased separative work units from the DOE before the Act's passage . . . . [T]he Act does not require contribution from a utility that contracted with the DOE if that utility re-sold the purchased services to another utility." Yankee Atomic, 112 F.3d at 1575 (emphasis in original). Yankee Atomic carefully delineates SWUs and purchased services from enriched material in determining what utilities are subject to assessment. In view of the cases interpreting this statutory scheme and the plain language of the statute itself, Union Electric should not be taken to foreclose the possibility that a utility could be assessed based on the SWUs it could not pass into the secondary market. Union Electric does not dictate the result achieved by the majority opinion.

Although the statutory language is plain and unambiguous and the agency regulations are not to be given deference, <u>see</u> <u>Information Tech. & Applications Corp. v. United States</u>, 316 F.3d 1312, 1320 (Fed. Cir. 2003), the DOE interpretation is consistent with assessing an original purchaser who did not transfer the entirety of contracted SWUs into the secondary market. The DOE interprets the statutory scheme such that "secondary market transactions cannot be allowed to effect a net increase or decrease, for Special Assessment purposes, in the total number of SWUs that were purchased from DOE for all purposes." Uranium Enrichment Decontamination and Decommissioning Fund; Procedures for Special Assessment of Domestic Utilities, 59 Fed. Reg. 41,956, 41,958-59 (Aug. 15, 1994). The DOE procedures speak directly to the case before this court:

> If a utility purchased DOE-produced SWUs from another utility, the purchasing utility's assessment will be based on the SWUs specified in contracts or other probative documents generated at the time of the secondary market purchase. The selling utility's assessment will be reduced by an amount that will be determined by the SWUs sold to the purchasing utility. For instance, in the event that the SWUs purchased in the secondary market transactions were less than the SWUs originally purchased from DOE, the selling utility will be assessed for the difference.

<u>Id.</u> at 41,958. The DOE even provides an example on point:

> Utility A purchases 100 SWUs from DOE. In a subsequent sale, Utility A changes the calculated SWUs and sells the 100 SWUs to Utility B in a transaction for only 80 SWUs. Utility B's assessment is based upon 80 SWUs. Utility A's assessment is based upon the remaining 20 SWUs unaccounted for in the secondary market transaction.

<u>Id.</u> at 41,959.

III

Even without deference to DOE pronouncements, the language of the statute and the precedent of this court, which both emphasize the reliance on the number of

SWUs contracted for by the original utility or those purchased by the secondary utility, indicate that the original contracting utility should be responsible for the assessment on the number of SWUs that it was unable to transfer in the secondary market. This makes sense in light of EPACT's purpose to distribute the costs of decommissioning and decontamination among all those utilities that contracted for or benefited from services from the government enrichment facilities. Under this interpretation, the due process analysis should proceed as annunciated in Commonwealth Edison and the original contracting utility should be responsible for the assessment on the SWUs it failed to transfer into the secondary market. Because the majority interprets the statutory assessment under EPACT incorrectly, I respectfully dissent.